# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Menssen v. Pneumo Abex Corp.*, 2012 IL App (4th) 100904

---

| | |
|---|---|
| Appellate Court Caption | JAYNE MENSSEN, Plaintiff-Appellee, v. PNEUMO ABEX CORPORATION, PNEUMO ABEX, LLC, METROPOLITAN LIFE INSURANCE COMPANY, OWENS-ILLINOIS, INC., and HONEYWELL INTERNATIONAL, INC., Defendants-Appellants.–JAYNE MENSSEN, Plaintiff-Appellee, v. HONEYWELL INTERNATIONAL, INC., Defendant-Appellant. |
| District & No. | Fourth District<br>Docket Nos. 4-10-0904, 4-10-0921 cons. |
| Filed | August 31, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In actions alleging that defendants engaged in a conspiracy to misrepresent or suppress the hazards of asbestos exposure, defendants' motions for judgment *n.o.v.* were improperly denied, since, pursuant to *Rodarmel*, plaintiff's evidence was not sufficient to prove such a conspiracy. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 09-L-71, the Hon. G. Michael Prall, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal

Reagan W. Simpson, of King & Spalding LLP, of Austin, Texas, Amy Eikel, of King & Spalding, of Houston, Texas, Robert W. Scott, of Swain, Hartshorn & Scott, and Karen L. Kendall and Craig L. Unrath, both of Heyl, Royster, Voelker & Allen, both of Peoria, Craig H. Zimmerman, Colleen E. Baime, and Michael W. Weaver, all of McDermott Will & Emery LLP, of Chicago, Dennis J. Dobbels, of Polsinelli, Shalton, Welte & Suelthaus, P.C., of Edwardsville, and Nicole C. Behnen and Luke J. Mangan, both of Polsinelli, Shalton, Welte & Suelthaus, P.C., of St. Louis, Missouri, for appellants.

Lisa Corwin and James Wylder, both of Wylder Corwin Kelly LLP, of Bloomington, for appellee.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Presiding Justice Turner specially concurred in the judgment, with opinion.

Justice Cook dissented, with opinion.

## OPINION

¶ 1    In March 2009, plaintiff, Jayne Menssen, sued defendants, Pneumo Abex, LLC, the successor of Pneumo Abex Corporation (Abex), and Honeywell International, Inc. (Honeywell), the successor of the Bendix Corporation (Bendix), among others, to recover damages for a malignancy caused by exposure to asbestos that occurred while Menssen was employed at the Union Asbestos and Rubber Company (UNARCO). Menssen's suit alleged that Abex, Honeywell, and UNARCO entered into a civil conspiracy to (1) falsely assert that exposure to asbestos was safe and (2) suppress information about the harmful effects of asbestos.

¶ 2    In February 2010, a jury returned a verdict in favor of Menssen and against Abex and Honeywell, awarding Menssen $3.5 million in compensatory damages, as well as punitive damages of $4.37 million against Abex and $10 million against Honeywell.

¶ 3    Abex and Honeywell appeal, alleging numerous deficiencies. Because we view this court's decision in *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th) 100463, 957 N.E.2d 107, as dispositive, we address only the claim raised by Abex and Honeywell that the trial court erred by denying their respective motions for a judgment notwithstanding the verdict (judgment *n.o.v.*). Consistent with our decision in *Rodarmel*, we reverse the court's judgment because the evidence Menssen presented was insufficient to prove Abex or

Honeywell conspired with other corporations to misrepresent or suppress the health hazards of asbestos exposure.

¶ 4                                                  I. BACKGROUND

¶ 5        From 1967 to 1969, UNARCO, a manufacturer and distributor of asbestos and asbestos products, employed Menssen. In her March 2009 complaint, Menssen claimed that (1) during her employment at UNARCO, she inhaled asbestos fibers and (2) she was exposed to asbestos products manufactured by, among others, Abex and Honeywell. Menssen alleged that this exposure later caused her to suffer from pleural mesothelioma–a malignancy of the membrane that surrounds the chest and lungs. Although her March 2009 complaint did not identify UNARCO as a defendant, Menssen alleged that UNARCO conspired with Abex and Honeywell to (1) falsely assert that exposure to asbestos was safe and (2) suppress information about the harmful effects of asbestos. Menssen alleged further that this conspiracy and the subsequent conduct in furtherance thereof proximately caused her illness.

¶ 6        Although Menssen was never employed by Abex or Honeywell, she introduced evidence to show that the actions Abex and Honeywell, as well as their predecessors, took with regard to their respective asbestos operations were parallel to–that is, consistent with–the conduct taken by the other alleged coconspirators. The theory underlying Menssen's civil-conspiracy claim was that Abex and Honeywell conspired with other corporations in the asbestos industry to misrepresent and suppress the health hazards of asbestos exposure. In particular, Menssen posited that despite knowing the dangers of asbestos exposure, Abex and Honeywell (1) sold products containing asbestos without health-hazard-warning labels and (2) failed to adequately protect their employees from exposure to asbestos. With regard to Abex, Menssen also claimed that it conspired with eight other corporations in the asbestos industry to unlawfully conceal information about the carcinogenic effect of asbestos from a scientific study.

¶ 7        At a trial that began in January 2010, Menssen presented evidence consistent with her claims, the majority of which was factually indistinguishable in any appreciable measure from the evidence presented in *Rodarmel*–a case this court decided involving the same claims against Abex and Honeywell, which we later discuss at length. Following the presentation of that evidence, the jury (1) returned a verdict in Menssen's favor and against Abex and Honeywell and (2) awarded Menssen $3.5 million in compensatory damages, as well as punitive damages of $4.37 million against Abex and $10 million against Honeywell.

¶ 8        In April 2010, Abex and Honeywell filed separate posttrial motions for judgment *n.o.v.*, which the trial court later denied.

¶ 9        This appeal followed.


¶ 10                                                  II. ANALYSIS
¶ 11                                          A. Civil Conspiracy Defined
¶ 12        A civil conspiracy is a "combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by

unlawful means." (Internal quotation marks omitted.) *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133, 720 N.E.2d 242, 258 (1999). For recovery under a civil conspiracy claim, the plaintiff must prove an agreement and a tortious act committed in furtherance of the agreement. *Id.* The agreement must be knowingly and intentionally made. *McClure*, 188 Ill. 2d at 133-34, 720 N.E.2d at 258. A "defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." (Internal quotation marks omitted.) *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258.

¶ 13     Because a civil conspiracy is almost never susceptible to direct proof, the conspiracy is usually established through circumstantial evidence and inferences drawn from the evidence. *Id.* Although evidence of parallel conduct by the alleged conspirators may serve as circumstantial evidence of a civil conspiracy, parallel-conduct evidence is insufficient, by itself, to establish the existence of an agreement to commit the civil conspiracy. *McClure*, 188 Ill. 2d at 135, 720 N.E.2d at 259.

¶ 14                              B. Standard of Review

¶ 15     We review *de novo* a trial court's denial of a motion for a judgment *n.o.v. McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257. "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Rodarmel*, 2011 IL App (4th) 100463, ¶ 86, 957 N.E.2d 107.

¶ 16     However, a ruling on a judgment *n.o.v.* also implicates the clear and convincing evidentiary standard. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 87, 957 N.E.2d 107. "[T]he evidence must be clear and convincing if a conspiracy is to be proved solely by circumstantial evidence." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 88, 957 N.E.2d 107. This standard applies to judgments *n.o.v.* as well as directed verdicts. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 87, 957 N.E.2d 107.

¶ 17          C. The Evidence Presented in *Rodarmel* and the Jury's Verdict

¶ 18     Although Abex and Honeywell raise in their appeal numerous alleged deficiencies in the trial court proceedings, we address only the claim that the court erred by denying the separate motions Abex and Honeywell filed for judgment *n.o.v.* As previously noted, because we view our decision in *Rodarmel* as dispositive, we first discuss the evidence presented in that case.

¶ 19     1. *The Parallel Conduct Evidence Presented To Show a Civil Conspiracy Existed*

¶ 20     In *Rodarmel*, 2011 IL App (4th) 100463, ¶ 4, 957 N.E.2d 107, the plaintiffs sued the defendants, Abex and Honeywell, alleging that the defendants conspired with other corporations to (1) falsely assert that asbestos exposure was safe and (2) withhold information about the harmful effects of asbestos. The majority of the evidence the plaintiffs

presented to show this civil conspiracy concerned circumstantial evidence to show parallel conduct–that is, the actions each defendant took with regard to its respective asbestos operations mirrored, or was in concert with, the actions of other alleged coconspirators. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 8, 957 N.E.2d 107.

¶ 21 The plaintiffs' theory was that by (1) concealing the dangers of asbestos from their employees and (2) fraudulently representing that the air inside their factories was safe, the defendants acted in conformity with a conspiratorial agreement they had with other corporations that were financially invested in promoting asbestos. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 8, 957 N.E.2d 107. In support of that theory, the plaintiffs presented the following circumstantial evidence: (1) in 1968, Johns-Manville, the exclusive supplier of asbestos to Bendix (Honeywell's predecessor), informed Bendix that its asbestos shipments would henceforth carry the warning " 'inhalation of this material over long periods may be harmful' " (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 10, 957 N.E.2d 107); (2) shortly after placing warning labels on its asbestos shipments, Johns-Manville sent Bendix a position paper that identified asbestosis (a scarring of the lungs), lung cancer, and mesothelioma as hazards resulting from asbestos exposure (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 11, 957 N.E.2d 107); (3) from 1930 through 1934, Albert L. Humphrey, chairman of the Westinghouse Air-Brake Company, was on the board of directors of Bendix and the American Brake Shoe and Foundry Company (Abex's predecessor) (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 13, 957 N.E.2d 107); (4) from 1959 through 1963, John D. Biggers, chairman of the Libbey-Owens-Ford Glass Company, was on the board of directors of Bendix and Johns-Manville (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 15, 957 N.E.2d 107); and (5) Abex, Bendix, Johns-Manville, and other corporations were members of the Friction Materials Standard Institute (FMSI), a trade organization created in 1948 to resolve issues regarding automobile brakes (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 14, 957 N.E.2d 107).

¶ 22    *2. The Additional Evidence Presented Against Abex*

¶ 23 In addition to the aforementioned evidence presented against Abex and Honeywell, the plaintiffs also introduced evidence that the American Brake Shoe and Foundry Company–along with eight other corporations in the asbestos industry–pledged to equally underwrite the cost of scientific experiments with asbestos dust. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 24, 957 N.E.2d 107. (Honeywell did not sponsor or participate in this study.) The cosponsors agreed that Dr. LeRoy U. Gardner, director of the Saranac Laboratory for the Study of Tuberculous, would perform the study, noting that the stated purpose of the asbestos dusting experiments was to determine the "cause and effects of asbestosis." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 18, 957 N.E.2d 107. The plaintiffs claimed that Abex subsequently conspired with its cosponsors to unlawfully conceal the carcinogenic effects of asbestos from the published version of Gardner's study. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 118, 957 N.E.2d 107.

¶ 24    *3. The Jury's Verdict and the Defendants' Posttrial Motions*

¶ 25 The jury awarded the plaintiffs $2 million in compensatory damages against the

defendants, as well as punitive damages of $100,000 against Abex and $400,000 against Honeywell. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 4, 957 N.E.2d 107.

¶ 26    Abex and Honeywell later filed motions for judgment *n.o.v.*, which the trial court later denied. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 5, 957 N.E.2d 107.

¶ 27        D. This Court's Parallel-Conduct Analysis in *Rodarmel* and Application
                of That Analysis to the Facts of This Case

¶ 28    In *Rodarmel*, the sole question this court addressed–the same question before us in this case–was whether the trial court erred by denying the posttrial motions Abex and Honeywell filed for a judgment *n.o.v. Rodarmel*, 2011 IL App (4th) 100463, ¶ 5, 957 N.E.2d 107. Because the plaintiffs in *Rodarmel* did not have direct evidence that established a civil conspiracy, we noted that the circumstantial evidence the plaintiffs presented had to satisfy the clear and convincing standard of review. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 100, 957 N.E.2d 107. Applying that standard, this court analyzed the evidence the plaintiff presented against Honeywell by parsing it into the following categories: (1) Bendix's buyer-seller relationship with Johns-Manville, (2) Bendix's position paper and further communications with Johns-Manville concerning asbestos, (3) Bendix's membership in the FMSI trade organization, and (4) Bendix's shared board of directors. *Id.*

¶ 29    Relying on the supreme court's decision in *McClure*, this court rejected Rodarmel's claim that the evidence presented was clear and convincing proof that established Honeywell's participation in a civil conspiracy. *Rodarmel*, 2011 IL App (4th) 100463, ¶¶ 106-17, 957 N.E.2d 107. In particular, we stated the following: (1) the inference of a conspiratorial agreement cannot be convincingly established by a buyer-seller relationship (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 106, 957 N.E.2d 107); (2) Bendix's purchase of asbestos from Johns-Manville was inherent in Rodarmel's parallel-conduct claim that Honeywell failed to adequately protect its employees from exposure to asbestos (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 107, 957 N.E.2d 107); (3) the sharing of information concerning asbestos among corporations in the asbestos industry does not provide clear and convincing evidence of a civil conspiracy (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 109, 957 N.E.2d 107); (4) "a conspiratorial agreement could not be inferred from membership in a trade organization" (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 113, 957 N.E.2d 107), and (5) inferring a civil conspiracy from a shared board director would be speculation, and liability based on such a dubious foundation " 'is contrary to tort principles in Illinois' " (*Rodarmel*, 2011 IL App (4th) 100463, ¶ 117, 957 N.E.2d 107 (quoting *McClure*, 188 Ill. 2d at 152, 720 N.E.2d at 267)).

¶ 30    In so concluding, this court declined to follow our decision in *Dukes v. Pneumo Abex Corp.*, 386 Ill. App. 3d 425, 900 N.E.2d 1128 (2008). *Rodarmel*, 2011 IL App (4th) 100463, ¶ 118, 957 N.E.2d 107. In *Dukes*, 386 Ill. App. 3d at 440, 900 N.E.2d at 1140, a different panel of this district acknowledged the supreme court's holding in *McClure* that more than parallel conduct was needed to prove a conspiracy. The *Dukes* court then proceeded to discuss the same four categories of evidence that the plaintiff presented over and above parallel conduct, holding that this additional evidence satisfied *McClure*. *Dukes*, 386 Ill. App.

-6-

3d at 445-46, 900 N.E.2d at 1144.

¶ 31        In rejecting the analysis in *Dukes*, we stated, as follows:

[W]e conclude that *Dukes* was incorrect in holding that the four items of additional evidence, over and above parallel conduct, justified the denial of Honeywell's motion for a judgment [*n.o.v.*] in that case. In that respect, we decline to follow *Dukes*. And because plaintiffs point to no additional evidence other than that which we have discussed in connection with *Dukes*, we hold that Honeywell likewise was entitled a judgment [*n.o.v.*] in the present case." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 118, 957 N.E.2d 107.

¶ 32        Although the majority of the evidence presented in this case was identical to the evidence presented in *Rodarmel*, Menssen posits that "[t]he record in this appeal is not the same as the record the appellate court was presented with in *Rodarmel*." We agree and note that Menssen offered the following additional evidence against Honeywell, which was not considered in *Rodarmel*: (1) in 1958, the State of New York Department of Labor promulgated "Rule No. 12" entitled, "Control of Air Contaminants in Factories," which listed asbestos dust in quantities greater than five million particles per cubic foot as a "dangerous air contaminant" (Bendix owned a factory located in Troy, New York, at that time.); (2) a 1959 advertisement, in which Bendix challenged the "jobber, rebuilder or dealer," to "do [its] part to protect the public by stocking only 'name brand' brake lining[s]–such as that made by Bendix or one of the other *reputable* manufacturers" (emphasis in original); (3) documents that showed the composition of dust at certain Bendix facilities prior to plaintiff's exposure; (4) a 1968 article published in *Bendix Today*, which contained (a) information on the quantity of brake linings produced at Bendix and (b) photographs documenting the conditions at the Bendix facilities; (5) in 1969, Bendix manufactured and sold "asbestos compound;" (6) a March 1972 Bendix internal memorandum entitled, "Third Visit by OSHA [(Occupational Health and Safety Administration)] to [Friction Materials Division]–Tennessee," which revealed that Bendix anticipated a citation for exceeding the "[five-]fibers-per-milliliter" maximum asbestos air quality standard imposed by OSHA; (7) sometime after 1972, Bendix distributed a booklet authored by Johns-Manville entitled, "What Every Employee Should Know about...ASBESTOS" that informed its employees about the dangers of asbestos; (8) a 1975 report found in Bendix's files, noting that no conclusive proof existed regarding a safe asbestos exposure level; (9) a 1983 Bendix internal memorandum, which identified questions and concerns from its employees regarding why they were not informed about or protected against the dangers of asbestos exposure; and (10) documents dated after implementation of OSHA that showed Bendix's policies and procedure to implement the new standards.

¶ 33        In addition to the evidence Menssen presented, this case involves exposure dates from 1967 to 1969, more than 10 years after the plaintiffs in *Rodarmel* were exposed. Despite Menssen's urging, however, we do not find the additional evidence or the expanded time frame clearly and convincingly shows a conspiratorial agreement among corporations in the asbestos industry. Simply put, the additional evidence merely shows the continued efforts Bendix engaged in–on its own accord and initiative–to misrepresent and suppress the dangers of asbestos exposure despite the increasing cascade of medical and scientific literature to the contrary.

¶ 34    Because we (1) agree with *Rodarmel*'s characterization of the evidence presented in that case, which includes our rejection of *Dukes*, and (2) find that the additional evidence offered by plaintiff was insufficient to prove Honeywell entered into a conspiratorial agreement with other corporations to suppress or misrepresent the dangers of asbestos, we conclude that Honeywell was entitled to a judgment *n.o.v.*

¶ 35    E. The Additional Evidence Menssen Presented Against Abex Regarding
the Saranac Laboratory Dusting Experiments

¶ 36    As previously explained, in addition to the evidence of the sharing of a director–evidence that we have earlier considered and rejected with regard to Honeywell–Menssen also presented evidence that Abex conspired with its cosponsors to unlawfully conceal information about the carcinogenic effects of asbestos from the published version of Gardner's study. In particular, Menssen presented the following pertinent evidence.

¶ 37    1. *The Evolution of the Dusting Experiments Conducted*
*by the Saranac Laboratory*

¶ 38    On November 19, 1936, a meeting of brake lining manufacturers was held in New York City. At that meeting, nine corporations in the asbestos industry voluntarily pledged to equally fund the cost of scientific experiments, which would study the effects of asbestos dust exposure. The following day, the sponsors of the study, which included UNARCO, Abex, and Johns-Manville, entered into a written agreement to that effect. (Honeywell neither sponsored nor participated in the study.) The written agreement identified Gardner as the scientist in charge of the experiments.

¶ 39    That same day, Vandiver Brown, general counsel for Johns-Manville, sent Gardner a letter on behalf of the cosponsors, authorizing him to "commence the contemplated experiments with asbestos dust for the purposes of determining more definitely the causes and effects of asbestosis." In his letter, Brown conveyed the following limitation upon the results of the study:

> "It is our further understanding that the results obtained will be considered the property of [the corporate cosponsors], who will determine whether, to what extent, and in what manner they shall be made public. In the event it is deemed desirable that the results be made public, the manuscript of your study will be returned to us for approval prior to publication."

On November 23, 1936, Gardner agreed to conduct the study subject to the sponsors' conditions. Brown later informed the other sponsors of Gardner's approval.

¶ 40    In the years that followed, Gardner provided the sponsors annual reports, outlining the progress of the scientific experiments. In February 1943, Gardner sent a letter to Brown, informing him that he had "at last succeeded in analyzing most of [the] voluminous experimental data and assessing the results." Attached to Gardner's letter was a report entitled, "Outline of Proposed Monograph on Asbestos," which explained that although "[n]o experiments were particularly designed to elucidate this point, *** certain evidence suggests

that asbestos may actually favor development of tumors in susceptible species." Gardner noted that 8 out of 11 mice that inhaled long fiber asbestos for 15 to 24 months developed malignant tumors. Gardner cautioned, however, as follows:

> "These observations are suggestive but not conclusive evidence of a cancer stimulating action by asbestos dust. They are open to several criticisms. The strain of mice was not the same in the asbestos experiment as in many of the others cited; apparently the former were unusually susceptible. Not enough animals survived in the dust for longer than the 15 months apparently necessary to produce many tumors. There were no unexposed controls of the same strain and age and no similar controls exposed to other dusts. It is hoped that this experiment can be repeated under properly controlled conditions to determine whether asbestos actually favors cancer of the lung."

Although Gardner conveyed that "[t]he question of cancer susceptibility now seems more significant than I had previously imagined," he recommended that any references to the incidences of cancerous tumors should be omitted from the final version of the study. Gardner then conveyed his intent to later provide a formal comprehensive report on the experiments.

¶ 41    In March 1943, Gardner applied for a federal research grant from the National Cancer Institute to conduct a properly controlled experiment on asbestos dust and lung cancer. In his application, Gardner described the results of his previous study but admitted that the "results with asbestos mean[t] nothing" because the experiments (1) were not intended to study the carcinogenic effects of asbestos and (2) lacked the proper controls.

¶ 42    In January 1944, the Committee on Cooperation in Cancer Research, which evaluated Gardner's $10,000 grant request, consulted with Dr. James J. Murphy, a committee member who–at that time–had the most experience in pulmonary cancer research. Murphy opined as follows:

> "This is the first time I have seen this application. I think it is bringing a very big gun to bear on a subject that probably will be settled in a very short time with a very slight expenditure of money. I think it is quite likely that you can induce cancer of the lung in mice in the strains that have genetic tendency for cancer of the lung. It is very easy to do. I believe the question can be settled in one comprehensive experiment, with a modest outlay of cost. It is a problem you can do here, for instance, at a cost of perhaps $20 to $30. I think we are hardly justified in appropriating $10,000 for it in a laboratory that isn't experienced in cancer research or in handling this particular type of material."

Thereafter, the committee denied Gardner's application, noting that the lack of genetic and proper clinical controls cast doubt on Gardner's belief that prolonged asbestos exposure causes cancer.

¶ 43    In 1946, Gardner died before completing the final report on the asbestos dust study. In September 1948, Saranac Laboratories prepared the final report of Gardner's scientific findings, which it delivered to Brown at Johns-Manville. The report mentioned the tumorous mice but noted a contradiction in Gardner's experimental notes where he referred to the tumors as "adenomas," benign, or nonmalignant tumors. (Adenomas are defined as a benign tumor of glandlike structure.)

¶ 44 In October 1948, Brown forwarded the final report from the Saranac Laboratory to the rest of the sponsoring companies. Brown requested that the report be treated with "the upmost confidence" and that it not be made available to anyone outside the sponsoring companies. Brown suspected that Saranac Laboratory desired to publish the study results, which Brown noted was "desirable from the point of view of the industry," provided "some of the speculative comments [were] omitted." Brown invited the sponsoring companies to a luncheon in Johns-Manville's boardroom to discuss whether the report should be revised before publication. Brown suggested that if a sponsoring corporation could not attend the luncheon, it designate a representative from another sponsoring corporation to act on its behalf.

¶ 45 On November 3, 1948, Dr. L.E. Hamlin, the former medical director for the American Brake Shoe and Foundry Company (now known as Abex), wrote a letter on the contents of the final report and the question of whether to make revisions before publication. In his letter, Hamlin, inferring Brown's concerns about the legal ramifications of the final unrevised version of the asbestos study, "confessed" that he did not observe "anything in the report in its present form which need cause undue concern." Brown explained as follows:

"I feel that since most of the basic facts with the exception of the more detailed studies mentioned in the report are already known and have been published in other studies on asbestos, no unfavorable reaction need be anticipated. I think the idea of reviewing the manuscript prior to publication is a good one in order to achieve mutual understanding with Saranac, but I feel that this can be accomplished quite satisfactorily without my presence."

Because Hamlin was unable to attend the luncheon, he requested Brown represent American Brake Shoe Company "in connection with the decisions to be made." Five days later, W.T. Kelly, Jr., executive vice president of American Brakebloc Division (a division of American Brake Shoe and Foundry Company) forwarded Hamlin's recommendations to Brown with a letter requesting Brown act as its representative at the luncheon.

¶ 46 On November 12, 1948, Brown informed Kelly by letter that the sponsoring companies unanimously voted to delete references to cancer and tumors from the final published report of the Saranac asbestos study because (1) the experiments were not devised to determine the incidence of cancer as a result of asbestos dust exposure, (2) Gardner previously indicated that the asbestos experiments should be correctly performed in a separate study, (3) Gardner recommended that the question of cancer susceptibility should be deleted from the study, and (4) the study unintentionally used a strain of mice susceptible to developing tumors. Brown also requested that Kelly return the copy of the unrevised final study he possessed because the sponsoring corporations agreed it would be "unwise to have any copies of the draft report outstanding if the final report is to be different in any substantial respect." Dr. Phillip C. Pratt, a pathologist retained by Abex who assisted in the preparation of the final report, agreed that it would have been inappropriate to include the study in the final report because of the lack of a control group.

¶ 47 In January 1951, Saranac Laboratory published its reports of Gardner's asbestos dust experiments in the American Medical Association Archives of Industrial Hygiene and

Occupational Medicine. The published version deleted (1) all references to tumors and malignancies in mice, and (2) the section that identified the contradiction between Gardner's outline and his experimental notes.

¶ 48                                    2. *The Application of Rodarmel*

¶ 49        We note that the plaintiffs in *Rodarmel* also presented evidence to support their claim–the same claim Menssen makes in this case–that Abex conspired with its cosponsors to unlawfully conceal the carcinogenic effects of asbestos from the published version of Gardner's study. We note further that a comparison of the evidence presented in *Rodarmel* regarding those experiments does not deviate in any meaningful respect from the evidence presented in this case on the same issue.

¶ 50        In rejecting the argument that the asbestos study showed Abex entered into a conspiratorial agreement, this court stated the following:

"In *** suppressing the cancer references, the sponsors could have done the right thing for the wrong reason. Even if the tumors in the mice scientifically proved nothing, publicizing them could have been prejudicial to Johns-Manville's business, or Johns-Manville could have had that fear. So, yes, it is an eminently reasonable inference that Johns-Manville, Abex, and other companies were concerned more about their own skin than about scientific integrity. The question, though, is not whether Abex's motives were pure. Instead, the question is whether Abex agreed 'to commit an unlawful act or a lawful act in an unlawful manner.' [Citation.] As far as we can see, it was not against the law, and it was not tortious, for the financing corporations to conceal the occurrence of tumors in a small group of mice if (1) the tumors were not scientific evidence of a relationship between asbestos and cancer and (2) it was unclear that any of the tumors were in fact cancerous. Granted, from the vantage of hindsight, we now know it is a scientific fact that asbestos causes cancer in humans. But it does not necessarily follow that asbestos caused the tumors (benign or malignant) in the eight or nine mice at Saranac Laboratory, some of which were genetically prone to develop tumors under any conditions. Unless Abex had notice that the tumorous mice were scientific evidence that asbestos caused cancer, Abex did not enter into a conspiratorial agreement by agreeing to conceal information about the tumorous mice–because concealing the information was not an unlawful or tortious act. It cannot be unlawful to hide information that is devoid of significance: information that, as Murphy put it, was 'not of any tremendous value.' " *Rodarmel*, 2011 IL App (4th) 100463, ¶ 124, 957 N.E.2d 107.

¶ 51        We adhere to our analysis in *Rodarmel* and conclude that, without more, Menssen failed to provide evidence that Abex agreed with other companies to suppress or misrepresent the health hazards of asbestos.

¶ 52        Accordingly, as we determined with regard to Honeywell, we conclude that Abex was entitled to a judgment *n.o.v.* because the additional evidence offered by plaintiff was insufficient to prove Abex entered into a conspiratorial agreement with other corporations to suppress or misrepresent the dangers of asbestos.

¶ 53                          III. CONCLUSION

¶ 54        For the reasons stated, we reverse the trial court's judgment.

¶ 55        Reversed.

¶ 56        PRESIDING JUSTICE TURNER, specially concurring.

¶ 57        While I concur in this opinion, I write separately to note I specially concurred in *Rodarmel* because I found unnecessary the majority's analysis on whether the evidence was sufficient to find Honeywell and Abex guilty of the tort of civil conspiracy. Nonetheless, a majority of the Fourth District Appellate Court justices has adopted *Rodarmel*'s sufficiency-of-the-evidence analysis as Fourth District precedent. Thus, under the doctrine of *stare decisis*, I concur in reversing the trial court's judgment denying defendants' motions for judgment *n.o.v.*

¶ 58        JUSTICE COOK, dissenting.

¶ 59        It is surprising that this court would conclude that the suppression of the results of the Saranac Laboratory research was no big deal. "Abex's agreement to conceal information about the tumorous mice was not an agreement to perform an unlawful act and hence was not a conspiratorial agreement. It cannot be unlawful to suppress information that apparently is devoid of any significance." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 128, 957 N.E.2d 107. Johns-Manville did not do anything wrong? UNARCO did not do anything wrong? That approach is inconsistent with previous decisions and with our supreme court's decision in *McClure*. There was direct evidence that UNARCO and Johns-Manville prevented information about the health hazards of asbestos from being published. *McClure*, 188 Ill. 2d at 143, 720 N.E.2d at 263. "[T]hese companies required Saranac Laboratory to omit references to cancer and tumors from the 1951 article it published concerning the results of asbestos research sponsored by Unarco, Johns-Manville, and other asbestos product manufacturers." *McClure*, 188 Ill. 2d at 143, 720 N.E.2d at 263. Abex was one of those "other asbestos product manufacturers."

¶ 60        The plaintiff in *Rodarmel* was a wife who contracted mesothelioma from breathing asbestos fibers that her husband carried home on his person and clothing. There is a split in the appellate court on whether defendants owe a plaintiff a duty in household or "take-home" asbestos exposure cases. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 34 n.3, 965 N.E.2d 1092 (Freeman, J., dissenting, joined by Burke, J.). *Simpkins* remanded to give plaintiff the opportunity to plead sufficient facts to establish a duty of care. The present case is not a household or "take-home" asbestos case. Plaintiff here was employed by UNARCO from 1967 to 1969, and later contracted mesothelioma.

¶ 61        To state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement. Parallel conduct, such as failing to warn and protect employees and consumers despite knowing that asbestos-containing products could cause disease, "may serve as circumstantial evidence of a civil conspiracy among

manufacturers of the same or similar products but is insufficient proof, by itself, of the agreement element of this tort." *McClure*, 188 Ill. 2d at 135, 720 N.E.2d at 259. Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy. Mere knowledge of the fraudulent or illegal actions of another is also not enough to show a conspiracy. "However, '[a] defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly[,] to do its part to further those objectives *** is liable as a conspirator.' " *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258 (quoting *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888, 894 (1994)). It is not necessary that defendant admit the conspiracy; evidence of an implicit agreement is enough. *McClure* quoted another case, suggesting what evidence would be sufficient: " 'The complaint contains no averments of meetings, conferences, telephone calls, joint filings, cooperation, consolidation, or joint licensing. The plaintiffs have alleged no more than a contemporaneous and negligent failure to act.' " *McClure*, 188 Ill. 2d at 138, 720 N.E.2d at 260 (quoting *Burnside v. Abbott Laboratories*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985)).

¶ 62 We have meetings, conferences, telephone calls, and cooperation in this case. Abex (American Brake Shoe Company) signed the Saranac Agreement. (Owens Corning, the defendant in *McClure*, was not a signatory to the Saranac Agreement.) Abex received a copy of the 1948 Saranac report from Vandiver Brown, Johns-Manville's general counsel. Brown requested the nine financing companies meet in the Johns-Manville boardroom November 11, 1948, "or designate some representative of another company to act for you in connection with decisions that will have to be made." Abex's medical director, Dr. Lloyd E. Hamlin, requested that Brown act for Abex. "I am sure our interest in the matter could be adequately protected by Mr. Brown." After the meeting, Brown asked that Abex return its copy of the Saranac report. "Everyone felt it would be most unwise to have any copies of the draft report outstanding if the final report is to be different in any substantial respect." Dr. Hamlin wanted to keep the report, promising to keep it confidential, but Brown asked W.T. Kelly, Jr., executive vice-president of Abex, to "prevail upon him to return it." Kelly agreed to do so. "There clearly was evidence here, other than evidence of parallel conduct, which was sufficient to establish the existence of an agreement between Abex and Johns-Manville to suppress or misrepresent information regarding the health hazards of asbestos." *Burgess v. Abex Corp.*, 311 Ill. App. 3d 900, 903, 725 N.E.2d 792, 795 (2000). Of course the defendants attached excuses to their decisions to suppress, in an attempt to justify those decisions. We should not give undue weight to those excuses.

¶ 63 Honeywell (Bendix) was not a signatory to the Saranac Laboratory agreement. However, from 1930 to 1934, one of its directors, Albert L. Humphrey, was also on the board of Abex. From 1959 to 1963, another of its directors, John D. Biggers, was also on the board of Johns-Manville. Bendix, Abex, and Johns-Manville were members of the Friction Materials Standard Institute, which in 1971 established the Asbestos Information Association to ensure "asbestos users [are] current on proposed regulations." "[M]embership in industrywide trade organizations and participation in scientific conferences are common in most industries and do not support an inference of agreement." *McClure*, 188 Ill. 2d at 147, 720 N.E.2d at 265 (citing *Payton v. Abbott Labs*, 512 F. Supp. 1031, 1038 (D. Mass. 1981)). The organizations

here were not simply industrywide trade organizations; they were narrowly structured to deal with a specific problem. *Rodarmel* says that sharing a director with an alleged coconspirator is no different than membership in an industrywide trade organization. *Rodarmel*, 2011 IL App (4th) 100463, ¶ 117, 957 N.E.2d 107. I disagree. A shared director allows continuous, one-on-one contact between the two companies, giving them specific advance knowledge of concerns and allowing them to participate in decisions. *Rodarmel* says the record "contain[s] no evidence of the extent to which the shared director actually controlled the decision making." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 117, 957 N.E.2d 107. Again, it is not necessary that defendant actually admit the conspiracy; implicit evidence is sufficient. There were certainly "meetings, conferences, telephone calls *** [and] cooperation" between Honeywell, Abex, and Johns-Manville. Their conduct was not simply "contemporaneous." *McClure* stated that meetings after the Califano announcement did not allow a reasonable inference of agreement, but the Califano announcement was in April 1978, and plaintiff's exposure to asbestos here occurred from 1967 to 1969.

¶ 64     " 'Judgment notwithstanding the verdict should not be entered unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.' " *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257 (quoting *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109, 679 N.E.2d 1202, 1208 (1997)). There was persuasive evidence, both explicit and implicit, of an agreement here. A circuit court may order a new trial if, after weighing the evidence, the court determines that the verdict is contrary to the manifest weight of the evidence–where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based on any of the evidence. *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257. The circuit court did not abuse its discretion when it denied the motion for a new trial in this case.