# Illinois Official Reports

## Supreme Court

***Jones v. Pneumo Abex LLC*, 2019 IL 123895**

| | |
|---|---|
| Caption in Supreme Court: | JOHN JONES *et al.*, Appellees, v. PNEUMO ABEX LLC *et al.*, Appellants. |
| Docket Nos. | 123895, 124002 cons. |
| Filed | December 19, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of Richland County, the Hon. William C. Hudson, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Craig L. Unrath, of Heyl, Royster, Voelker & Allen, P.C., of Peoria, Gary C. Pinter, of Swanson, Martin & Bell, LLP, of Edwardsville, Reagan W. Simpson, of Yetter Coleman LLP, of Houston, Texas, and Raymond H. Modesitt, of Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, LLP, of Terra Haute, Indiana, for appellant Pneumo Abex LLC. |
| | Robert H. Riley, Matthew J. Fischer, Edward Casmere, Joshua D. Lee, and Sarah E. Finch, of Riley Safer Holmes & Cancila LLP, of Chicago, for other appellant. |
| | Charles Lynn Corwin and James Wylder, of Wylder Corwin Kelly LLP, of Bloomington, for appellees. |

Justices          JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Burke and Justices Garman and Neville concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

Justices Thomas and Theis took no part in the decision.


**OPINION**

¶ 1      At issue in these consolidated appeals is whether Owens-Illinois, Inc. (Owens-Illinois), and Pneumo Abex LLC (Pneumo Abex) may have conspired with others to suppress information regarding the dangers of exposure to asbestos. Twenty years ago, in *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102 (1999), we held that jury verdicts entered against Owens Corning and Owens-Illinois, Inc., based on claims of civil conspiracy virtually identical to those asserted here could not stand and that those defendants were entitled to judgment as a matter of law. Our appellate court reached the same conclusion with respect to similar claims of civil conspiracy leveled against Pneumo Abex. *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th) 100463; *Menssen v. Pneumo Abex Corp.*, 2012 IL App (4th) 100904; *Gillenwater v. Honeywell International, Inc.*, 2013 IL App (4th) 120929 (also affirming entry of judgment notwithstanding the verdict (judgment *n.o.v.*) in favor of Owens-Illinois as well as upholding summary judgment for both defendants and against a spouse on a related loss of consortium claim). Applying the foregoing precedent, the circuit court in this case granted summary judgment in favor of Owens-Illinois and Pneumo Abex on plaintiffs' claims that the companies had been part of a conspiracy to conceal the harmful effects of exposure to asbestos. The appellate court, however, reversed and remanded for further proceedings, holding that genuine issues of fact remained, precluding summary judgment. 2018 IL App (5th) 160239. For the reasons that follow, we now reverse the appellate court's judgment and remand to that court for further proceedings.

¶ 2                            BACKGROUND

¶ 3      In February 2013, John Jones and his wife, Deborah, filed this action in the circuit court of Richland County to recover damages they suffered when John contracted lung cancer. The Joneses' complaint alleges that John's lung cancer resulted from his exposure to asbestos, "including asbestos from one or more" of the numerous companies named as defendants in the case, while he was involved in the construction industry "from 1962 through the 1970's" and while he repaired the brakes on motor vehicles he owned during the same time period.[1]

---

[1] In addition to Owens-Illinois, Inc., and Pneumo-Abex LLC, plaintiffs' complaint named as defendants Akzo Nobel Paints, LLC, formerly known as The Glidden Co.; American Biltrite, Inc.; American Tar Products, Inc., formerly known as Koppers Products, Inc.; Ameron International Corporation; Bechtel Corporation; Bird Incorporated; Borg Warner Corporation "by its successor-in-interest Borg Warner Morse Tec, Inc."; Brand Insulations, Inc.; Caterpillar, Inc.; "CBS Corporation, formerly known as Viacom, Inc., Merger to CBS Corporation, formerly known as Westinghouse

¶ 4    Only two of the named defendants are involved in this appeal, Owens-Illinois and Pneumo Abex. Both were alleged to have been "in the business of manufacturing and distributing asbestos and asbestos containing products." Specifically, Pneumo Abex is claimed to have made some of the brake linings and pads John used when repairing his vehicles, while Owens-Illinois manufactured Kaylo brand pipe covering, an insulation product alleged to have been present at construction sites where John worked.

¶ 5    The Joneses' six-count complaint sought to hold Owens-Illinois and Pneumo Abex liable on various theories. Count I asserted that these defendants and others knew that asbestos was dangerous but conspired to misrepresent its dangers and to falsely represent that exposure to asbestos and asbestos-containing products was safe or nontoxic. Count I further alleged that Owens-Illinois and Pneumo Abex similarly conspired to "fail to provide information about the harmful effects of asbestos to exposed persons."

¶ 6    Numerous specific acts were alleged to have been performed in furtherance of this conspiracy. Specifically, the Joneses asserted that "[o]ne or more of the Conspirators," a group that included Owens-Illinois and Pneumo Abex,

"a) sold asbestos products which were used at the locations where John Jones worked without warning of the hazards known to the seller, including the sale and use of products of Johns-Manville, Owens Corning, and Owens-Illinois, which exposed John Jones to asbestos;

b) refused to warn its own employees about the hazards of asbestos known to it, specifically included is the refusal of Unarco and Owens Corning to warn their employees at the Bloomington, Illinois plant during the years 1951-1972;

c) edited and altered the reports and drafts of publications initially prepared by Dr. Lanza concerning the hazards of asbestos during the 1930's;

d) agreed in writing not to disclose the results of research on the effects of asbestos upon health unless the results suited their interests;

e) obtained an agreement in the 1930's from the editors of ASBESTOS, the only trade magazine devoted exclusively to asbestos, that the magazine would never publish articles on the fact that exposure to asbestos caused disease, and sustained this agreement into the 1970's;

Electric Corporation"; CSR, Inc.; CSR, Ltd.; Certainteed Corporation; Chicago Gasket Company; Cleaver-Brooks, a Division of Aqua-Chem, Inc.; Conwed Corporation; Crane Company; Crown Cork & Seal USA, Inc.; DAP, Inc.; De Witt Products Co.; Domco Products Texas, L.P.; Draco Mechanical Supply, Inc.; Duro Dyne Corporation; Foster Wheeler Energy Corporation; General Electric Company; General Gasket Corporation; General Refractories Co.; Georgia Pacific Corporation; The Goodyear Tire & Rubber Company; Homasote Company; Honeywell International, Inc.; Industrial Holding Corporation; J-M Manufacturing Company, Inc.; John Crane, Inc.; J.P. Bushnell Packing Supply Co.; Kaiser Gypsum Company, Inc.; Karnak Midwest, LLC; KCG, Inc.; Kelly Moore Paint Company; Kelsey-Hayes Company; Kimberly-Clark Corporation; McMaster-Carr Supply Co.; Mannington Mills, Inc.; Mechanical Insulation Co. Inc.; Metropolitan Life Insurance; National Service Industries, Inc.; Oakfabco, Inc.; Rapid-American Corporation; Sherwin-Williams Company; Simpson Timber Company; Sprinkmann Sons Corporation; SPX Cooling Technologies, Inc.; Superior Boiler Works, Inc.; Thiem Corporation; Trane U.S. Inc.; Tremco, Inc.; Union Carbide Corporation; Weil-McLain Company; Welco Manufacturing Company; York International Corporation; and Zurn Industries LLC.

f) suppressed the dissemination of a report by Dr. Gardner in 1943 which was critical of the concept that there was a safe level of asbestos exposure;

g) through their control of the Asbestos Textile Institute (ATI), defeated further study of the health of workers when William Hemeon graphically demonstrated the need for such study and dissemination of information in the 1940's;

h) edited and altered the reports and drafts of publications regarding asbestos and health initially prepared by Dr. Vorwald during 1948-1951;

i) suppressed the results of the Fibrous Dust Studies conducted during 1966-74 by the Industrial Health Foundation, Inc., Johns-Manville, Raybestos Manhattan, Owens Corning, Pittsburgh Corning Corporation and PPG Industries, which results demonstrated and confirmed that exposure to asbestos caused lung cancer and mesothelioma;

j) acting under the name of NIMA, published a pamphlet entitled 'Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos' in which they purported to inform readers about the health hazards of airborne asbestos, but withheld, among other facts, that asbestos caused serious disease and death, including cancer, that there was no cure for asbestos disease, and that there was no known safe level of exposure to asbestos;

k) purchased asbestos which did not contain warnings from coconspirators, to which the purchaser then exposed its own employees without warning of the hazards known to the seller and purchaser, including the purchase of asbestos by Owens-Illinois from Unarco;

l) refused to warn its employees who had to use asbestos-containing materials in the manufacture of other products of the conspirator of the hazards of exposure to asbestos known to the conspirator, including the refusal of Owens-Illinois to warn its employees who were exposed to asbestos in connection with the manufacture of glass products of the hazards of asbestos known to Owens-Illinois;

m) purchased asbestos which did not contain warnings from co-conspirators, to which the purchaser then expected [*sic*] its own employees without warning of the hazards known to the seller and purchaser, including the purchase of asbestos by Bendix (n/k/a Honeywell) from Johns-Manville;

n) refused to warn its employees who had to use asbestos-containing materials in the manufacture of other products for the conspirator of the hazards of exposure to asbestos known to the conspirator, including the refusal of Bendix to warn its employees who were exposed to asbestos in connection with the manufacture of friction products of the hazards of asbestos known to Bendix; and

o) altered, including the deletion of all references to the association of asbestosis and lung cancer, the original report of the study performed by Braun of the Industrial Hygiene Foundation before the altered version was published in 1958."

¶ 7    According to count I of the complaint, "the agreement or understanding" between the conspirators and the acts done in furtherance of the agreement or understanding were the proximate cause of John's injuries, and defendants should be held jointly and severally liable for the damages he sustained. Count II of the complaint was premised on the same theory and was directed at the same defendants but sought relief for John's spouse, Deborah, who claimed

that, because of John's injury, she suffered "an injury to her husband/wife relationship and became obligated for the expense of the medical care" he received.

¶ 8        Counts III and IV of plaintiffs' complaint sounded in negligence and sought damages for John and Deborah, respectively, on the grounds that defendants had "manufactured and sold asbestos containing products which were used by [John] or others in his proximity at the locations where [he] worked;" that John had contracted lung cancer as a result of being exposed to asbestos from defendants' products; that defendants "knew, or should have known, that exposure to asbestos caused pulmonary fibrosis and malignancies;" and that defendants were negligent for having failed to warn that exposure to asbestos could cause serious disease, including pulmonary fibrosis and malignancies, and could result in death and for having failed to provide proper instruction "as to safe methods, if any existed," for handling and processing products containing asbestos. Counts V and VI were to the same effect but contended that defendants' conduct was willful and wanton and sought punitive as well as actual damages.

¶ 9        Following various developments not relevant here, including minor amendments to the complaint and dismissal of certain counts as to certain defendants, Pneumo Abex moved for summary judgment pursuant to section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2014)) with respect to the claims asserted against it for civil conspiracy. As grounds for that motion, Pneumo Abex argued that the civil conspiracy claims leveled here were based on the same facts as those underlying the civil conspiracy claims advanced unsuccessfully by other plaintiffs in *Rodarmel*, 2011 IL App (4th) 100463, *Menssen*, 2012 IL App (4th) 100904, and *Gillenwater*, 2013 IL App (4th) 120929, and in numerous other cases resolved in Pneumo Abex's favor at the trial court level. Pneumo Abex asserted that nothing new has been presented in this case that would warrant a different outcome. Accordingly, as in those prior cases, it contended that plaintiffs' conspiracy claims should fail as a matter of law.

¶ 10       Two months later, Owens-Illinois filed its own motion for summary judgment. Its motion sought judgment in the company's favor with respect to all six counts of plaintiffs' complaint. Regarding counts III through VI, which were predicated on the contention that John Jones had been directly exposed to asbestos dust, Owens-Illinois asserted that plaintiffs' claims must fail as a matter of law because there is "no evidence that Jones was ever exposed to any asbestos-containing product manufactured or sold by Owens-Illinois, let alone evidence of exposures that occurred on a frequent, regular and proximate basis."

¶ 11       As to counts I and II, which sought to impose liability based on the theory of civil conspiracy, Owens-Illinois contended that all of the evidence advanced by plaintiffs here has already been considered and found lacking by this court in *McClure*, 188 Ill. 2d 102, and various lower courts in Illinois, including the same appellate court decisions cited by Pneumo Abex in its motion for summary judgment, *Rodarmel*, 2011 IL App (4th) 100463, *Menssen*, 2012 IL App (4th) 100904, and *Gillenwater*, 2013 IL App (4th) 120929. Owens-Illinois further noted that in the previous three years, various Illinois circuit courts and one United States district court had granted Owens-Illinois summary judgment more than 60 times in cases involving precisely the same civil conspiracy claim asserted here. As did Pneumo Abex, Owens-Illinois contended that the evidence presented by the Joneses is similarly insufficient as a matter of law to support a finding that the company had engaged in any actionable civil conspiracy. In addition, Owens-Illinois argued that plaintiffs' loss of consortium counts are

fatally defective because, among other things, Deborah was not yet married to John at the time the actionable conduct alleged in their complaint occurred.

¶ 12 Following a hearing, the circuit court entered separate orders disposing of each of these summary judgment motions. With respect to the motion filed by Pneumo Abex, the circuit court held that the parties had "readily admitted at argument that the body of evidence in the instant matter is the same as that in *Rodarmel v. Pneumo Abex LLC*, 2011 IL App (4th) 100463," where the appellate court held that the circuit court should have granted Pneumo Abex's motion for a directed verdict on the civil conspiracy claims asserted against it there "not only because of a lack of duty but also because of a lack of clear and convincing evidence on the agreement element of a civil conspiracy." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 132.

¶ 13 In the circuit court's view, the only distinction between the record in *Rodarmel* and the record here was testimony by Dr. Arthur Frank regarding the scientific validity of the Gardner study referenced in plaintiffs' complaint. As had other circuit courts in similar cases, the circuit court here concluded that this difference was unimportant. "[O]n the materials issues," the court believed, "this matter is indistinguishable from *Rodarmel*." It therefore adopted the findings and analysis of that case and held that, as a matter of law, Pneumo Abex did not enter into a conspiracy to suppress the hazards of asbestos and "[t]he alleged injury-causing conduct was not committed in furtherance of that conspiracy that [Pneumo] Abex allegedly joined because [Pneumo] Abex joined no conspiracy." Accordingly, it entered summary judgment in favor of Pneumo Abex and against plaintiffs on the civil conspiracy claims.

¶ 14 With respect to Owens-Illinois, plaintiffs indicated at the hearing that they would not oppose entry of summary judgment against them as to counts III through VI, the direct exposure counts, based on the record then before the court. The circuit court's summary judgment order therefore addressed only the merits of Owens-Illinois's motion as to counts I and II, the civil conspiracy counts. Echoing its ruling with regard to Pneumo Abex, the court wrote that "[c]ounsel for Plaintiffs and Defendant readily admitted at argument that the body of evidence in the instant matter is the same as that in *Gillenwater v. Honeywell International, Inc.*, 2013 IL App (4th) 120929." In that case, which contained the same civil conspiracy claim asserted here, the Fourth District concluded that, when all of the evidence was viewed in the light most favorable to the plaintiffs and all reasonable inferences were drawn in their favor, the evidence so overwhelmingly favored Owens-Illinois and the other defendants that no verdict against them could ever stand. *Gillenwater*, 2013 IL App (4th) 120929, ¶ 123. Finding *Gillenwater* indistinguishable, the circuit court here adopted its findings and analysis and concluded that summary judgment in favor of Owens-Illinois was proper.

¶ 15 Although the circuit court's summary judgment orders did not fully resolve the litigation, the court entered separate orders pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) in which it made express written findings that there was no just reason for delaying the appeals. Plaintiffs appealed. The appellate court reversed and remanded for further proceedings, concluding that, at this stage of the proceedings, "there are no definitive answers to the disputed questions of fact presented by plaintiffs" regarding the existence of the conspiracy they claimed and that summary judgment was therefore inappropriate. 2018 IL App (5th) 160239, ¶ 23.

¶ 16 In its opinion, the appellate court cited our previous decision in *McClure*, 188 Ill. 2d 102, which overturned a jury verdict that had been entered against Owens-Illinois on a civil

- 6 -

conspiracy claim virtually identical to plaintiffs' on the grounds that the evidence, when viewed in the light most favorable to the plaintiffs in that case, so overwhelmingly favored Owens-Illinois that no contrary verdict could ever stand. The appellate court invoked *McClure*, however, only for general principles governing claims for civil conspiracy. It made no substantive comparison between the facts presented in that case and those asserted here. Indeed, after its perfunctory reference to *McClure* in the first paragraph of the analysis section of its opinion (2018 IL App (5th) 160239, ¶ 9), the appellate court never mentioned it again.

¶ 17 The appellate court also referenced two of the three appellate decisions cited by Pneumo Abex and Owens-Illinois in support of their summary judgment motions, *Rodarmel*, 2011 IL App (4th) 100463, and *Gillenwater*, 2013 IL App (4th) 120929. As indicated earlier in this opinion, those cases, like *McClure*, likewise included civil conspiracy claims against defendants based on virtually the same facts and theories as those asserted against them by plaintiffs here, and both were ultimately resolved in defendants' favor. Despite this, the appellate court did not consider them dispositive. After undertaking a cursory examination of the two decisions, it found them distinguishable for one basic reason: they arose from motions for judgment notwithstanding the verdict rather than summary judgment. In the appellate court's view, applying precedent involving judgment *n.o.v.* "rather than the rationale and black letter law of summary judgment stands the concept of summary judgment on its head and results in our appellate court, in effect, trying the case." 2018 IL App (5th) 160239, ¶ 23. It therefore determined that those decisions were not controlling.[2]

¶ 18 The appellate court made no mention of a third case cited by the circuit court, *Menssen*, 2012 IL App (4th) 100904. That case, which involved a civil conspiracy claim against Pneumo Abex, was decided after *Rodarmel* and involved later exposure dates and additional evidence not considered by the *Rodarmel* court. After reviewing that additional evidence, the appellate court in *Menssen* determined that it was insufficient to alter the court's previous conclusion, and as in *Rodarmel*, it concluded that Pneumo Abex was entitled to judgment notwithstanding the verdict, reversing outright the jury's determination that the company had conspired to suppress or misrepresent the health hazards of asbestos. *Id.* ¶¶ 49-54. Because *Menssen* involved judgment *n.o.v.* rather than summary judgment, we presume the appellate court here would have rejected it for the same reason it rejected *Rodarmel* and *Gillenwater*.

¶ 19 Shortly before the appellate court filed its opinion in August 2018, a different district of the appellate court decided another virtually identical civil conspiracy case involving Pneumo Abex and Owens-Illinois, *Johnson v. Pneumo Abex, LLC*, 2018 IL App (3d) 160406-U. There, as here, the circuit court had granted summary judgment in favor of both defendants. Plaintiffs, also a husband and wife, appealed. In contrast to the appellate court panel in this case, the appellate court in *Johnson* found *Rodarmel*, *Menssen*, and *Gillenwater* to be applicable.

---

[2]While ultimately unimportant to our resolution of this case, we feel obliged to point out that the appellate court's characterization of *Gillenwater* was inaccurate. The loss of consortium claim asserted by the spouse in that case *was* decided on a motion for summary judgment, not a motion for judgment *n.o.v.* On appeal, the appellate court agreed that summary judgment was properly entered against the spouse because manufacturers owe no duty to a future spouse and the couple was not yet married at the time of the alleged exposure. *Gillenwater*, 2013 IL App (4th) 120929, ¶ 151. As our summary of the case has indicated, Owens-Illinois raised the same argument in response to Deborah's loss of consortium claim here.

- 7 -

Consistent with that precedent, it affirmed the circuit court's entry of summary judgment in favor of Pneumo Abex and Owens-Illinois and against plaintiffs. We denied plaintiffs' petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. July 1, 2018), with one justice dissenting. *Johnson v. Pneumo Abex, LLC*, No. 123820 (Ill. Sept. 26, 2018). We subsequently allowed petitions for leave to appeal filed in this case by Pneumo Abex and Owens-Illinois and consolidated their appeals for briefing and disposition.

¶ 20                                                    ANALYSIS

¶ 21    Because this appeal arises from the appellate court's reversal of a circuit court order granting summary judgment, our review is *de novo. Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

¶ 22    As noted earlier in this opinion, the question of whether Pneumo Abex or Owens-Illinois engaged in a civil conspiracy to conceal the dangers of asbestos has been frequently litigated in the courts of this state. Such claims often fail at the summary judgment stage. In those instances where they have proceeded to trial before a jury and resulted in verdicts favorable to the plaintiffs, reviewing courts have consistently concluded that these companies could not be held liable for civil conspiracy as a matter of law and entered judgment notwithstanding the verdicts in their favor. Our opinion in *McClure*, 188 Ill. 2d 102, is among these decisions. So too are the appellate court opinions in *Rodarmel*, 2011 IL App (4th) 100463, *Menssen*, 2012 IL App (4th) 100904, and *Gillenwater*, 2013 IL App (4th) 120929.

¶ 23    Instead of undertaking a meaningful evaluation of the applicability of the legal principles governing civil conspiracy as articulated in that precedent, and with no real assessment of whether and to what extent any factual differences between those cases and this one might justify a different result, the appellate court summarily distinguished the prior decisions on the sole grounds that the civil conspiracy claims advanced against Owens-Illinois and Pneumo Abex in those cases were decided in the context of motions for judgment notwithstanding the verdict, while here they were resolved on motions for summary judgment. In taking that approach, the appellate court committed reversible error.

¶ 24    The appellate court correctly noted that summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); 2018 IL App (5th) 160239, ¶ 12. The problem with the appellate court's analysis is that it subsequently failed to properly appreciate that this case does not present the typical summary judgment scenario, where the issues in dispute have yet to face the scrutiny of a trier of fact and the objective is to determine whether a genuine issue of material fact exists. See *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 305. Rather, it arises from a long and well-documented historical record that has been thoroughly explored and aggressively tested in the course of scores of lawsuits spanning more than two decades involving conduct that occurred long ago. Consistent with that background, the pleadings, affidavits, and other materials submitted by the parties, both in support of and in opposition to the motions for summary judgment, were exhaustive. The parties appear to have left nothing out, and they make no claim that there is additional evidence that still needs to be uncovered before the matter can be properly considered by the trier of fact.

¶ 25    In such cases, there is no practical difference between the standard for summary judgment and that governing directed verdicts. Even if some issue of fact is presented by the summary judgment motion, if " 'what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered.' " *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 27 (quoting *Fooden v. Board of Governors of State Colleges & Universities*, 48 Ill. 2d 580, 587 (1971)); *Koziol v. Hayden*, 309 Ill. App. 3d 472, 477 (1999).

¶ 26    To be sure, *McClure*, *Rodarmel*, *Menssen*, and *Gillenwater* involved entry of judgment *n.o.v.* rather than directed verdicts. This distinction, however, is of no consequence. The identical standard applies in either case (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 498-99 (1967); *Maple v. Gustafson*, 151 Ill. 2d 445, 453 n.1 (1992)), namely whether all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand (*Harris v. Thompson*, 2012 IL 112525, ¶ 15).

¶ 27    Under these circumstances, the appellate court clearly erred in failing to follow our decision in *McClure* and in distinguishing the various related appellate decisions involving civil conspiracy claims against Owens-Illinois and Pneumo Abex on the grounds that the standard governing defendants' motions in this case was different. The standard is the same. If judgment *n.o.v.* were proper, summary judgment would also be proper.

¶ 28    To hold otherwise would be nonsensical. If all relevant evidence is already before the court and upon such evidence there would be nothing left to go to a jury so that the court would be required to direct a verdict, denying summary judgment to permit further proceedings to take place would serve no purpose. The outcome would not change.

¶ 29    This is something the appellate court here failed to grasp. It was as if it had picked up a suspense novel and declared the mystery unsolved based on the first few chapters without bothering to finish the book. Had it proceeded to the end, the answers to its questions would have been revealed to the extent they were capable of ever being revealed. The book was complete. There would have been nowhere else to look.

¶ 30    The circuit court did not make this same mistake. Rather than focus on discrete and limited aspects of the voluminous record, it reviewed all of the evidence, as we did in *McClure* and as the appellate court did in *Rodarmel*, *Menssen*, and *Gillenwater*; it applied the "clear and convincing" standard of proof we found applicable where, as here, a plaintiff seeks to establish a civil conspiracy based on circumstantial evidence (*McClure*, 188 Ill. 2d at 134); and it concluded that plaintiffs could not prevail as a matter of law.

¶ 31    Contrary to the appellate court's view, this approach does not "stand[ ] the concept of summary judgment on its head." 2018 IL App (5th) 160239, ¶ 23. Rather, it is entirely consistent with the recognition that the use of summary judgment "in a proper case is to be encouraged and its benefits inure not only to the litigants, in the saving of time and expenses, but to the community in avoiding congestion of trial calendars and the expenses of unnecessary trial." *Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813, 819 (1981).

¶ 32    In sum, the appellate court should not have set aside the circuit court's judgment without undertaking a similarly thorough review. It must now do so. If the circuit court is correct that the evidence is insufficient as a matter of law to impose liability on defendants based on civil

conspiracy, as other courts have so often concluded in the past, remanding to the circuit court for further proceedings, as the appellate court did, serves no valid purpose. It merely wastes judicial resources and needlessly prolongs the ultimate disposition of this litigation.

¶ 33 In reaching this resolution, we hasten to add that we express no view on the merits of the Joneses' appeal to the appellate court. While history and precedent present a steep hill for those plaintiffs to climb, nothing in this disposition should be read as foreclosing the possibility that their appeal may prove meritorious. Our point is simply that, in conducting its review, the appellate court must undertake a complete analysis in accordance with the correct legal standards articulated in our decisions and other established case law.

¶ 34                                            CONCLUSION

¶ 35 For the foregoing reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court for further proceedings consistent with this opinion.

¶ 36 Reversed and remanded.

¶ 37 JUSTICE KILBRIDE, dissenting:

¶ 38 In this case, the appellate court concluded that genuine issues of material fact exist on whether Owens-Illinois, Inc., and Pneumo Abex LLC conspired with other companies to conceal information about the harmful effects of exposure to asbestos. In my view, the appellate court did not err in holding that genuine issues of material fact remain on this question, thus precluding summary judgment in favor of Owens-Illinois and Pneumo Abex. Accordingly, I respectfully dissent from the majority's decision reversing the appellate court's judgment.

¶ 39 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Summary judgment is a drastic means of disposing of litigation, and it should be granted only when the movant's right to judgment is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. A motion for summary judgment should be denied if there is a dispute as to a material fact or if reasonable people may draw divergent inferences from the undisputed material facts. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22.

¶ 40 A civil conspiracy is " 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.' " *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999) (quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998)). To state a claim for civil conspiracy, the plaintiff must allege both an agreement and a tortious act in furtherance of that agreement. *McClure*, 188 Ill. 2d at 133 (citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-64 (1994)). A conspiracy is almost never established by direct proof. *McClure*, 188 Ill. 2d at 134 (citing *Walsh v. Fanslow*, 123 Ill. App. 3d 417, 422 (1984)). Rather, it usually must be proven using " 'circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.' " *McClure*, 188 Ill. 2d at 134 (quoting *Adcock*, 164 Ill. 2d at 66). The evidence of a civil conspiracy must be clear and convincing if it is shown by circumstantial evidence. *McClure*, 188 Ill. 2d at 134.

¶ 41    I believe the appellate court correctly applied those legal principles in holding that the trial court erred in granting summary judgment in favor of Pneumo Abex and Owens-Illinois. Previous cases have provided a substantial amount of evidence weighing on the question of a civil conspiracy. See, *e.g.*, *McClure*, 188 Ill. 2d 102; *Gillenwater v. Honeywell International, Inc.*, 2013 IL App (4th) 120929; *Menssen v. Pneumo Abex Corp.*, 2012 IL App (4th) 100904; *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th) 100463. In my view, a reasonable person could conclude from that vast collection of evidence that defendants conspired with other companies to suppress information about the health hazards of asbestos. See *McClure*, 188 Ill. 2d at 154-57 (Harrison, J., dissenting) (concluding that the evidence presented in *McClure* was sufficient to support the jury's finding of a civil conspiracy to suppress information about the health hazards of asbestos).

¶ 42    Furthermore, plaintiffs have submitted additional evidence in this case on the Saranac Laboratory experiments. Those experiments are particularly important in this case. The evidence presented previously on those experiments is described in *McClure*, *Rodarmel*, and *Menssen* and is briefly summarized as follows.

¶ 43    In 1936, Pneumo Abex entered into an agreement with other companies to fund experiments studying the effects of asbestos dust exposure. The agreement provided that Dr. LeRoy U. Gardner, director of the Saranac Laboratory for the Study of Tuberculosis, would perform the study. After several years of study, Dr. Gardner sent Vandiver Brown, general counsel for asbestos producer Johns-Manville, a report stating that "certain evidence suggests that asbestos may actually favor development of tumors in susceptible species." Dr. Gardner noted that, although the observations were "open to several criticisms," they were "suggestive but not conclusive evidence of a cancer stimulating action by asbestos dust." The report indicated 8 of the 11 mice that inhaled long fiber asbestos for 15 to 24 months developed malignant tumors. Dr. Gardner expressed a desire to repeat the experiment under controlled conditions "to determine whether asbestos actually favors cancer of the lung."

¶ 44    Dr. Gardner applied for a federal research grant from the National Cancer Institute to conduct a controlled experiment. In his application, Dr. Gardner described the results of his study but admitted they "mean nothing" because the experiments were not intended to study the carcinogenic effects of asbestos and were not conducted with proper controls. Dr. Gardner's application for funding was ultimately denied, and he died in 1946, before completing a final report on the asbestos dust study.

¶ 45    In 1948, Saranac Laboratory completed a final report on Dr. Gardner's scientific findings and delivered it to Vandiver Brown at Johns-Manville. Brown then forwarded the report to the rest of the sponsoring companies with the request that it be kept confidential. Brown invited the companies to a meeting to discuss whether the report should be revised prior to publication. Pneumo Abex asked Brown to represent it at that meeting.

¶ 46    Brown subsequently informed Pneumo Abex that the sponsoring companies had voted unanimously to delete references to cancer and tumors in mice from the final report. Brown asked Pneumo Abex to return its copy of the unrevised final report because the sponsoring companies agreed it would be "unwise to have any copies of the draft report outstanding if the final report is to be different in any substantial respect." In 1951, Saranac Laboratory published its report of Dr. Gardner's experiments in the American Medical Association Archives of

Industrial Hygiene and Occupational Medicine. The published version of the final report deleted all references to tumors and cancer in mice.

¶ 47    In *Rodarmel*, the appellate court rejected the argument that the agreement among the sponsoring companies to alter the final report on the Saranac Laboratory experiments established a conspiracy to conceal the health hazards of asbestos. The *Rodarmel* court found that the tumors in the group of mice did not constitute scientific evidence that asbestos caused cancer and asserted "[i]t cannot be unlawful to hide information that is devoid of significance." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 124. The appellate court concluded that "absent a qualified expert opinion that the tumorous mice were scientific evidence of a relationship between asbestos and cancer *** Abex's agreement to conceal information about the tumorous mice was not an agreement to perform an unlawful act and hence was not a conspiratorial agreement." *Rodarmel*, 2011 IL App (4th) 100463, ¶ 128. The appellate court followed that same reasoning in *Menssen*, 2012 IL App (4th) 100904, ¶ 51, holding that, "without more, [the plaintiff] failed to provide evidence that Abex agreed with other companies to suppress or misrepresent the health hazards of asbestos." Thus, the conclusion that the Saranac Laboratory experiments were not scientifically reliable was critical to the appellate court's holdings in *Rodarmel* and *Menssen*.

¶ 48    In this case, the record includes new information on the potential scientific validity of the Saranac Laboratory experiments. Plaintiffs provided the deposition testimony of Dr. Arthur Frank, an expert in asbestos diseases, that the Saranac Laboratory experiment results would have been "significant scientific evidence on the issue of whether there was a relationship between asbestos and cancer." Additionally, plaintiffs presented a letter written by Dr. Kenneth Lynch to Metropolitan Life Insurance Company in 1947, stating he reviewed Dr. Gardner's outline and found it "valuable and publishable as it stands."

¶ 49    This additional evidence weighs on the decision of Pneumo Abex and the other sponsoring companies to delete from the report any reference to tumors and cancer in mice and on their joint effort to ensure no copies of the original report referencing cancer and tumors remained outstanding. Given the new evidence on the potential scientific validity of the Saranac Laboratory experiments, the agreement to delete references to cancer and tumors from the final published report may be more readily seen as a conspiracy to suppress valid evidence of the potential health hazards of asbestos exposure. The additional evidence may also cast a new light on the parallel industry actions to suppress the health hazards of asbestos presented in this and previous cases. See *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308 (2008) (in reviewing a summary judgment disposition, the court must consider all evidence together and construe it liberally in favor of the nonmoving party). Overall, I believe a reasonable person could infer from the new evidence on the scientific validity of the Saranac Laboratory experiments, along with all the other evidence of parallel industry conduct presented by plaintiffs in this and previous cases, that Pneumo Abex conspired with other companies to conceal information about the potential health risks of asbestos.

¶ 50    Our appellate court has also held that clear and convincing evidence shows Owens-Illinois and Owens Corning entered into a conspiratorial agreement to sell Kaylo insulation containing asbestos without providing a warning about the health risks posed by that product. *Gillenwater v. Honeywell International, Inc.*, 2013 IL App (4th) 120929, ¶ 96. Owens-Illinois and Owens Corning entered into a distributorship agreement in 1953, providing that Owens Corning would

market the Kaylo insulation manufactured by Owens-Illinois. *Gillenwater*, 2013 IL App (4th) 120929, ¶ 55. The appellate court explained that "[d]uring the period of the distributorship agreement, 1953 to 1958, both companies knew that Kaylo dust was potentially a respiratory hazard, that it might scar the lungs of people who breathed it," and the distributorship agreement implied an understanding that the companies would conceal the potential dangers of Kaylo. *Gillenwater*, 2013 IL App (4th) 120929, ¶ 96. Indeed, silence by the two companies about the known dangers posed by asbestos "was essential to the marketing and selling of Kaylo." *Gillenwater*, 2013 IL App (4th) 120929, ¶ 96.

¶ 51       According to the *Gillenwater* court, Owens-Illinois withdrew from the conspiracy in 1958, when it sold its Kaylo insulation division to Owens Corning. *Gillenwater*, 2013 IL App (4th) 120929, ¶¶ 107-18. The appellate court stated "[t]he record gives no basis for supposing that, after 1958, Owens-Illinois cared whether Owens-Corning sold any more Kaylo." *Gillenwater*, 2013 IL App (4th) 120929, ¶ 107.

¶ 52       While I agree that the evidence establishes a conspiracy between Owens-Illinois and Owens Corning, I believe the issue of whether and when Owens-Illinois withdrew from that conspiracy presents a question of material fact inappropriate for summary judgment. The appellate court observed that plaintiffs presented evidence indicating the two companies "remained close" following the sale of the Kaylo division in 1958. 2018 IL App (5th) 160239, ¶ 17. For instance, Owens-Illinois continued to provide packaging for Kaylo insulation until the late 1960s, and Owens-Illinois continued to have a large financial stake in Owens Corning. Additionally, Owens-Illinois continued to use asbestos in its own factories during the 1970s. Given those facts, Owens-Illinois certainly would have continued to benefit from the agreement to conceal information about the health hazards of asbestos exposure.

¶ 53       In my view, summary judgment is inappropriate here because plaintiffs presented sufficient evidence to create a disputed question of fact on whether and when Owens-Illinois withdrew from the conspiracy to conceal information about the health hazards of asbestos. The totality of the evidence, when viewed in the light most favorable to plaintiffs, could be sufficient to establish a conspiracy by clear and convincing evidence continuing through the time of plaintiff's alleged initial asbestos exposure in the 1960s.

¶ 54       In sum, defendants' right to judgment on plaintiffs' claims is not clear and free from doubt. Based on the voluminous facts presented in this case, a reasonable person could determine that defendants conspired with other companies to suppress information about the health hazards of asbestos. The drastic remedy of summary judgment is, therefore, not an appropriate means of disposing of this litigation. See *Seymour*, 2015 IL 118432, ¶ 42. I would affirm the appellate court's reversal of the grant of summary judgment in favor of Owens-Illinois and Pneumo Abex. Accordingly, I respectfully dissent.

¶ 55       JUSTICES THOMAS and THEIS took no part in the consideration or decision of this case.