FIRST DIVISION
September 22, 2008

No. 1-07-2986

| | | |
|---|---|---|
| RICHARD WIEDENBECK, Individually and as Special Administrator of the Estate of CHERYL ANDERSON-WIEDENBECK, deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| HOWARD SEARLE, M.D., | ) ) | Honorable James P. Flannery, Jr. |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE WOLFSON delivered the opinion of the court:

The only question in this medical malpractice case is whether the evidence of record demonstrates a genuine issue of material fact: was Dr. Howard Searle's breach of the applicable standard of care a proximate cause of Cheryl Anderson-Wiedenbeck's injuries and subsequent death? Granting Dr. Searle's motion for summary judgment, the trial court found there was insufficient evidence of proximate cause to take the case to a jury. We agree with the trial court.

FACTS

On November 1, 2001, Cheryl Anderson-Wiedenbeck (Wiedenbeck), a 38 year-old mother of two, went to the Convenient Care of Stratford North urgent care facility (Stratford), complaining of a severe headache. Dr. Searle, a family practice

physician, took her medical history and examined her. Wiedenbeck told Dr. Searle she had suffered from migraines in the past but this one was more severe than any previous headache, having lasted over two days. She had been treated with over-the-counter migraine medication without relief, and was experiencing shooting pains and nausea without vomiting. Dr. Searle noted she had a slight fever, "boggy" nasal mucosa, and the inability to clear her ears. Dr Searle performed a routine neurological examination, which indicated Cheryl Wiedenbeck was within the normal limits. She was diagnosed with sinusitis and eustachian tube dysfunction and discharged with antibiotics. She was advised to follow-up with her primary care physician or return to the clinic if she did not improve. Dr. Searle did not order a CT scan or a neurological consultation.

On Friday, November 2, 2001, Wiedenbeck's headache worsened, causing her to call back to Stratford. Kim Stock, the nurse with whom she spoke, told her to give the antibiotics time to work and to come back to the center the following day if she did not feel better. Later that evening, Cheryl Wiedenbeck's husband called Stratford and said his wife had started vomiting and her headache had worsened. He was told to take her to the emergency room.

At approximately 9:45 p.m. on November 2, 2001, Dr. Joseph Boyle, an emergency room physician at Central DuPage Hospital,

saw Wiedenbeck. Dr. Boyle ordered a CT scan, which was analyzed by Dr. Gregory Zweig, a neuroradiologist. The CT scan revealed a colloid cyst in the third ventricle, which was causing significant hydrocephalus, possible downward tonsillar herniation, and possible downward transtentorial herniation. Dr. Boyle consulted with the on-call neurosurgeon, Dr. Douglas Johnson. Rather than coming in to see the patient himself, Dr. Johnson suggested she be transferred to a university setting better equipped to handle her problem.

Wiedenbeck was transferred to the University of Chicago hospital. When she arrived at approximately 3:00 a.m. on November 3, 2001, Dr. Christian Sikorski examined her. He found her condition stable and ordered that an extraventricular drain kit (EVD) be kept at Wiedenbeck's bedside. Surgical removal of the cyst was scheduled for later that morning. At approximately 5:10 a.m. on November 3, 2001, Wiedenbeck's condition worsened and she suffered a brain herniation. Dr. Sikorski then inserted the EVD. As a result of the herniation, Wiedenbeck experienced irreversible brain damage which ultimately led to her death in a rehabilitation facility on October 5, 2005.

There is a factual dispute regarding whether Dr. Boyle told Dr. Johnson and Dr. Sikorski the full results of the CT scan. Both Dr. Johnson and Dr. Sikorski testified they were not advised

of Dr. Zweig's herniation findings and would have responded differently if they had known. In his deposition, Dr. Sikorski said he would have performed the EVD immediately upon Wiedenbeck's admission to the University of Chicago hospital had he known the severity of Dr. Zweig's findings. This conflict in testimony has no bearing on the case against Dr. Searle.

Richard Wiedenbeck, special administrator of Cheryl Wiedenbeck's estate, filed a medical malpractice lawsuit against Convenient Care of Stratford, Dr. Searle, Central DuPage Hospital, Dr. Boyle, the University of Chicago, and Dr. Sikorski. Plaintiff settled his claim against the University of Chicago for $4.3 million and voluntarily dismissed the action against Dr. Sikorski.

Following a hearing, the trial court granted Dr. Searle's motion for summary judgment, finding plaintiff failed to present sufficient evidence of proximate cause to take the case to a jury. The trial court denied plaintiff's 304(a) motion for leave to pursue an immediate appeal of the summary judgment order. Plaintiff then voluntarily dismissed the remaining defendants in the case, rendering the summary judgment order final.

DECISION

Plaintiff contends the trial court erred in granting summary judgment in favor of Dr. Searle. Specifically, plaintiff

contends the record contains expert testimony sufficient to create a factual question concerning the proximate cause element of his action.

"Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law."  Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 216 Ill. 2d 294, 305, 837 N.E.2d 99 (2005).  Although a party is not required to prove his case at the summary judgment stage (Northern Illinois, 216 Ill. 2d at 306), the plaintiff must present sufficient evidence to create a genuine issue of material fact (Hussung v. Patel, 369 Ill. App. 3d 924, 931, 861 N.E.2d 678 (2007)).  We review an order granting summary judgment de novo. Hussung, 369 Ill. App. 3d at 931.

A plaintiff in a medical malpractice case must prove: " '(1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress.' "  Hussung, 369 Ill. App. 3d at 931, quoting Sunderman v. Agarwal, 322 Ill. App. 3d 900, 902, 750

N.E.2d 1280 (2001). The parties agree this case turns on whether plaintiff's experts adequately established a material question of fact regarding whether Dr. Searle's allegedly negligent treatment proximately caused Wiedenbeck's injuries and subsequent death. For our analysis of the summary judgment we find no factual dispute concerning Dr. Searle's deviation from the standard of care.

While the issue of proximate cause is ordinarily a question of fact for the jury (Townsend v. University of Chicago Hospitals, 318 Ill. App. 3d 406, 410, 741 N.E.2d 1055 (2001)), at the summary judgment stage the plaintiff must present affirmative evidence that the defendant's negligence was arguably a proximate cause of the plaintiff's injuries (Hussung, 369 Ill. App. 3d at 931). If the plaintiff fails to do so, summary judgment is proper as a matter of law. Hussung, 369 Ill. App. 3d at 931; Gyllin v. College Craft Enterprises, Ltd., 260 Ill. App. 3d 707, 711, 633 N.E.2d 111 (1994).

Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. Susnis v. Radfar, 317 Ill. App. 3d 817, 826-27, 739 N.E.2d 960 (2000); Aquilera v. Mount Sinai Hospital Medical Center, 293 Ill. App. 3d 967, 975, 691 N.E.2d 1 (1998). The causal connection between treatment, or a delay and treatment, and the claimed injury "must not be

contingent, speculative, or merely possible." Aquilera, 293 Ill. App. 3d at 976.

An expert's opinion is only as valid as the reasons for the opinion. Petraski v. Thedos, 382 Ill. App. 3d 22, 28, 887 N.E.2d 24 (2008); Kleiss v Cassida, 297 Ill. App. 3d 165, 174, 696 N.E.2d 1271 (1998). While testimony grounded in "expert analysis of the known physical facts" is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant. Petraski, 382 Ill. App. 3d at 31; Kleiss, 297 Ill. App. 3d at 174; Aquilera, 293 Ill. App. 3d at 975.

In Aquilera, we considered whether the plaintiff failed to present any evidence of proximate cause. Aquilera visited an emergency room with complaints of numbness on the left side of his body. He began suffering seizures shortly after being admitted to the hospital. A CT scan revealed a massive cerebral hemorrhage. Aquilera lapsed into a coma and died three days later. In a wrongful death medical malpractice action against the hospital, the plaintiff, Aquilera's wife, offered testimony from two expert witnesses that the emergency room physician should have ordered an immediate CT scan, given Aquilera's condition.

The emergency medicine expert, Dr. Hamilton, asserted the delayed CT scan was "definitely related" to Aquilera's death.

1-07-2986

Aquilera, 293 Ill. App. 3d at 969. Even assuming Aquilera received a prompt CT scan, however, Dr. Hamilton acknowledged he would have deferred to a neurosurgeon to decide whether surgical intervention was necessary. The plaintiff's neurology expert, Dr. Vuckovich, testified it was critical that an early CT scan be performed not only to permit effective treatment of the patient, but also to determine the precise location and size of the hemorrhage while still treatable. Dr. Vuckovich did not know, however, whether surgical intervention would have been ordered had a prompt CT scan been administered. The trial court entered judgment notwithstanding the verdict for the defendant.

Affirming the directed verdict, we held:

"The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case. *** Plaintiff failed to offer evidence to a reasonable degree of medical certainty that the alleged negligent delay in administering the CT scan lessened the effectiveness of the medical treatment given to Aquilera." Aquilera, 293 Ill. App. 3d at 975.

The record contained no evidence to support the plaintiff's experts' opinion that the negligent delay in administering the CT scan lessened the effectiveness of treatment.  Aquilera, 293 Ill. App. 3d at 974.  "When there is no factual support for an expert's opinion, the conclusions alone do not create a question of fact."  Aquilera, 293 Ill. App. 3d at 974.

Similarly, in Townsend, the plaintiff contended an imaging study should have been performed in the emergency room to diagnose a urinary tract obstruction.  Dr. Leslie and Dr. Hancock, plaintiff's experts, both testified the defendant deviated from the standard of care.  When Dr. Leslie was asked what the defendant would have done if she had complied with the standard of care and immediately ordered an imaging study, Dr. Leslie said "[s]he would call another type of physician once she made the diagnosis."  On cross-examination, Dr. Leslie said an imaging test would have increased Puckett's chance of survival, even if it may not have saved her life.  Dr. Hancock testified Puckett's chance of survival would approach zero without having the obstruction removed.  She would have had a 40 to 60 percent survival rate if the obstruction had been diagnosed and treated in the emergency room.  On cross-examination, the defendant's attorney asked Dr. Hancock the following questions:

> "Q: Now, it's your opinion that had she

[the defendant] ordered this test, a [kidney stone] might have been seen \*\*\* right?

A: It might have been seen at the location of the stone of the ureter [found at Puckett's autopsy].

Q: You further testified that if it had been identified, it would require immediate attention, correct?

A: Yes.

Q: You're not the type of doctor that would provide that next intervention, are you?

A: No, that's correct.

Q: What type of doctor would do that?

A: One of two types, a urologist or an interventional radiologist.

Q: Both of which are outside your area of expertise, correct?

A: Yes."

Considering Aquilera, we asked whether the record contained any evidence to support the opinion of the plaintiff's experts that the negligent delays--an imaging test or transferring Puckett to the emergency room--" 'lessened the effectiveness of

treatment?' " Townsend, 318 Ill. App. 3d at 412, quoting Aquilera, 293 Ill. App. 3d at 974. Because there was no expert testimony that an earlier imaging test or an earlier transfer to an intensive care unit would have led to surgical intervention or other treatment that may have contributed to the Puckett's recovery, we concluded the jury was left to speculate about proximate cause. Townsend, 318 Ill. App. 3d at 412. Simply saying Puckett's chances of survival would go from 0% to 60% if "relief" had been provided did not address the causation gap. We vacated the jury's verdict in favor of the plaintiff and remanded the cause to the trial court with directions to enter judgment in favor of the defendant. Townsend, 318 Ill. App. 3d at 412.

Of relevance here is Susnis v. Radfar, 317 Ill. App. 3d 817, 827-29, 739 N.E.2d 960 (2000), where plaintiffs contended that had the radiologist properly interpreted an x-ray, subsequent doctors would have had the opportunity to treat the child's enlarged heart condition and possibly avoid or minimize her injuries. A review of the record established the plaintiffs' experts offered only an opinion on the radiologist's deviations from the standard of care, but no expert evidence was adduced to a reasonable degree of medical certainty that the radiologist's deviations proximately caused the child's injuries. We affirmed the trial court's directed verdict in favor of the radiologist,

1-07-2986

holding the mere possibility of a causal connection was not enough to sustain the burden of proving proximate cause.

To determine whether the plaintiff in this case presented sufficient evidence to create an issue of material fact regarding proximate cause, we have examined the deposition testimony contained in the record.

Dr. Brown, a family medicine physician, testified that Dr. Searle deviated from the standard of care by failing to order both a CT scan and a neurological or neurosurgical consult when he examined Cheryl Wiedenbeck. With regard to failing to consult a neurologist or neurosurgeon, Dr. Brown said:

> "It's a deviation from the standard of care.
> It has to be the best of what anyone can say.
> And that requires, since he's not a
> neurologist or neurosurgeon, to get an expert
> in there to make sure he's not missing
> something. He didn't do that. That directly
> caused the delay in diagnosis and all the
> pain, suffering, and neurological disease
> that poor Cheryl Wiedenbeck suffered."

Dr. Brown said he could not interpret the standard of care for a neurologist or neurosurgeon, but he could tell what a neurologist or neurosurgeon would do with a patient presenting with the worst

headache of their life associated with nausea--"and that would be to rule out some sort of intracranial process with detailed neurological exam, CBC, sed rate, and CT or MRI of the brain or both."

Dr. Searle's attorney asked Dr. Brown when the diagnosis and treatment would have been made had Dr. Searle ordered a CT scan:

"Q. Can you tell me when the diagnosis would have been instituted if Dr. Searle did as you said he should have done in ordering the CT scan? When would the results have come back? When would the diagnosis have been made? When would the referrals have been made? What's the time frame you are talking about?

A. She was seen at 2:05 p.m. at Stratford Convenient Care Center. She was sent home at 1530, which would be 3:30. Had he [Dr. Searle] taken the history -- Actually, had he considered the history properly, called a neurosurgeon, or better informed the patient that he couldn't rule out some sort of intracranial process and sent her directly to Central DuPage Hospital

emergency room, let's say, she gets there by 3:30, 4:00 o'clock.

Q. She leaves at 3:30, so starting then.

A. Okay. *** Let's say, give her a half-hour to get there. It's 4:00 o'clock. He should have called the emergency room, talked to the emergency room doctor, told him that he's concerned about intracranial –- an intracranial event of some sort and that this lady needed CT of the brain or MRI or both and stat neurological consultation.

Q. Was a CT scan available for this patient at 4:00 p.m. on November 30 --

A. Yes.

Q. November 1st --

A. Yes.

                    ***

Q. Would you agree, Doctor, that you are unable to state to a reasonable degree of medical certainty exactly when she would have had the definitive surgery at U of C?

A. Oh, I didn't think we were talking about diagnosis. And I would assume that, A,

a neurosurgeon would have been called and somebody would either come in and seen the patient -- what I had said is a neurosurgical consultation was required --

***

Q. My question is, would you agree that it's purely speculation on your part to state when definitive treatment of this colloid cyst would have been undertaken at U of C or somewhere else.

A. True. Yeah, exactly. It's pure speculation. All I can say is it would have been sooner, and sooner would have been better.

Q. How do you know it would have been sooner if you can't say when?

A. Well, if somebody met the standard of care, it would have been sooner.

***

Q. Okay. Then -- But if you assume for purposes of this question that University of Chicago deviated from the standard of care in the care and treatment they provided to Mrs.

Wiedenbeck on Saturday morning, you would

agree that you could not state to a reasonable degree

of medical certainty they would not do the same thing

and deviated from the standard of care if they were to

see her on Friday?

***

A. I can't respond to that.

Q. Why is that?

A. I don't know any of the information

involved, and it's -- I'm not a neurosurgeon.

I have no opinions on that."

Dr. Brown said, however, that Wiedenbeck "had on ongoing process where the increased intracranial pressure put more stress on the brain," "*** which means that it would have been less if it had been timely diagnosed and treated by Dr. Searle."

Dr. Larkins, plaintiff's neurology expert, testified that Dr. Searle was required to order a CT scan in this case.  Dr. Larkins testified that if an EVD had been placed when Wiedenbeck arrived at the University of Chicago or prior to 3:30 a.m. on Saturday November 3, 2001 (the time Cheryl Wiedenbeck's condition began to deteriorate), she would not have suffered brain damage. Dr. Searle's attorney asked Dr. Larkins whether a CT scan conducted on Thursday would have warranted any type of treatment

prior to Saturday morning:

> "Q. Do you know whether the CT scan
>
> would have shown hydrocephalus on Thursday?
>
> A. I don't.
>
> Q. Do you know whether or not the
>
> findings on the CT scan would have warranted
>
> any type of intervention prior to Saturday?
>
> A. I don't.
>
> Q. You would agree that that would be
>
> speculative?
>
> A. Yes."

Dr. Larkins agreed the CT scan taken on November 2, 2001, provided the physicians at Central DuPage Hospital with a window of opportunity to treat Wiedenbeck before the herniation reached a critical stage.

On cross-examination, plaintiff's attorney asked whether it was reasonable to assume the CT scan would have shown some abnormalities:

> "Q. You said you didn't know, in
>
> response to a question, whether the CT
>
> would show hydrocephalus.  Is it
>
> reasonable to assume it would show some
>
> abnormalities based on what we know now?

> MS. BUSCH: Objection, calls
>
> for speculation.
>
> THE WITNESS: You'd see -- the
>
> colloid cyst certainly didn't just
>
> form. Yeah, I mean, you would see
>
> that.
>
> Q. And colloid cyst has a
>
> unique presentation?
>
> A. Yes. And, you know, unique
>
> appearance."

Based on the headaches Wiedenbeck had been having, Dr. Larkins agreed it was probably more true than not that Wiedenbeck had suffered from some type of ongoing hydrocephalus prior to her first visit with Dr. Searle.

Dr. Sikorski, the physician who treated Wiedenbeck at the University of Chicago, testified that if Dr. Boyle had told him the CT scan conducted on November 2, 2001, showed evidence of possible herniation in addition to a colloid cyst, he would have treated her differently when she arrived at the University of Chicago. Dr. Sikorski said evidence of an ongoing herniation "would be an indication to do something emergently or urgently, urgently, emergently," likely prompting him to insert "an EVD right away." Dr. Sikorski did not say whether an earlier CT scan

conducted on Thursday November 1, 2001, would have indicated intracranial pressure or possible herniation.

Plaintiff contends the expert testimony established that without Dr. Searle's professional negligence, an EVD would have been inserted sooner and Wiedenbeck would have been saved. Specifically, plaintiff contends Dr. Brown's testimony that treatment "would have been sooner, and sooner would have been better" had Dr. Searle ordered a CT scan, mixed with Dr. Larkins' testimony that placing an EVD at any time prior to 3:30 a.m. on Saturday would have prevented Wiedenbeck from suffering any brain damage, adequately established a material question of fact regarding whether Dr. Searle's deviations from the standard of care proximately caused Wiedenbeck's injuries.

Relying on Aquilera and Townsend, however, we find plaintiff failed to offer evidence to a reasonable degree of medical certainty that the alleged negligent delay in administering a CT scan lessened the effectiveness of her medical treatment.

A CT scan was conducted by Dr. Boyle in the emergency room sometime after 9:45 p.m. on Friday November 2, 2001. The scan revealed the presence of a colloid cyst in the third ventricle. Wiedenbeck did not suffer the brain herniation until around 5:00 a.m. on Saturday November 3, 2001, after she had been transferred to the University of Chicago and examined by Dr. Sikorski.

Dr. Larkins, plaintiff's neurology expert, testified that had an EVD been placed to relieve the intracranial pressure when Wiedenbeck arrived at the University of Chicago at 3:00 a.m. on Saturday, or at any time prior to 3:30 a.m. when her condition began to deteriorate, she would not have suffered brain damage as a result of the intracranial pressure. Nothing in either of the plaintiff's experts' testimony suggested, however, that an analysis of a CT scan on Thursday would have led to earlier surgical intervention or treatment. In fact, Dr. Brown admitted it would be "pure speculation" to state when definitive treatment of the colloid cyst would have been undertaken if Dr. Searle had ordered a CT scan. All Dr. Brown could say regarding causation is that treatment "would have been sooner, and sooner would have been better." As Dr. Brown noted, Dr. Searle would have had to consult and defer to a neurologist or neurosurgeon regarding Wiedenbeck's treatment after a CT scan or neurological consult had been ordered.

Although Dr. Larkins indicated some type of abnormality would have been observable in a CT scan conducted on Thursday, November 1, he admitted he did not know whether the findings on a CT scan conducted on Thursday would have shown "hydrocephalus" and would have warranted any type of intervention prior to Saturday.

Although both of plaintiff's medical experts agreed Dr. Searle deviated from the proper standard of care by failing to order a CT scan or neurological consult while treating Wiedenbeck, we find no expert evidence was offered to a reasonable degree of medical certainty that Dr. Searle's alleged deviation caused Wiedenbeck's injuries or lessened the effectiveness of her medical treatment. "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation." Susnis, 317 Ill. App. 3d at 827. Even viewing the evidence in the light most favorable to plaintiff, we find sufficient evidence of proximate cause is lacking in the record before us.

CONCLUSION

We affirm the trial court's summary judgment order.

Affirmed.

R. GORDON, P.J., and HALL, J., concur.