NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241143-U

NO. 4-24-1143

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 26, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JACQUELINE DUNBAR, as Special Administrator of the Estate of Bruce Smith, Deceased, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Putnam County |
| v. | ) | No. 19L3 |
| WADE D. CARLSON, M.D. and OSF MULTI-SPECIALITY GROUP, d/b/a OSF MEDICAL GROUP, | ) ) ) | Honorable Paul E. Bauer, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Lannerd and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court reversed, finding the trial court erred in granting defendants' motion for summary judgment.

¶ 2     Plaintiff, Jacqueline Dunbar, as special administrator of the Estate of Bruce

Smith, sued defendants, Wade D. Carlson, M.D., and OSF Multi-Speciality Group, OSF Medical

Group (OSF), bringing a medical malpractice and wrongful death action under section 2-622 of

the Code of Civil Procedure (Code) (735 ILCS 5/2-622 (West 2018)). The complaint alleged

Bruce Smith died "[a]s a result of one or more *** negligent acts or omissions of the

defendant[s]." Pursuant to section 2-1005(c) of the Code (735 ILCS 5/2-1005(c) (West 2024)),

defendants moved for summary judgment, which the trial court granted.

¶ 3     On appeal, Dunbar argues the trial court erred because a genuine issue of material

fact exists relating to proximate cause, namely, whether Dr. Carlson's approach in treating Smith

"increased the risk that [he] would suffer a myocardial infarction, and deprived [him] of a chance

at earlier treatment that could have been successful." We agree and reverse.

¶ 4                                              I. BACKGROUND

¶ 5            Bruce Smith suffered a heart attack and died on August 23, 2017. He had been under the care of his primary care physician, Dr. Carlson of OSF, since January 2017. Smith established care with Dr. Carlson as a follow-up to a 2016 hospitalization for a pulmonary embolism. The initial January 2017 examination and laboratory results (compared to October 2016 results) revealed Smith suffered hypertension and advancing kidney disease. A February 2017 ultrasound confirmed Smith had severe hydronephrosis. In May 2017, an examination by Dr. Carlson's nurse practitioner, along with lab results, indicated Smith's kidney condition reached critical levels. Later that month, Carlson referred Smith to a urologist and a nephrologist, who treated him for an enlarged prostate, urinary retention, obstructive outlet syndrome, and kidney failure. Over the summer, Smith's urinary retention and kidney function improved with treatment.

¶ 6            From January to July 2017, Smith's blood pressure fluctuated but remained elevated. During that time, Dr. Carlson prescribed Smith various medications to treat his hypertension, including lisinopril, hydrochlorothiazide, and terazosin. By May, as Smith's bladder and kidney function worsened, the lisinopril and hydrochlorothiazide had been put "on hold" because they could worsen kidney function. Likewise, due to his kidney disease, by May 2017, Smith was no longer taking Xarelto, a blood thinner that had been prescribed after the 2016 pulmonary embolism. Dr. Carlson never prescribed Smith a statin as part of his blood pressure medication regimen.

¶ 7            In August 2019, Dunbar initiated these proceedings by filing a complaint pursuant to section 2-622 of the Code (735 ILCS 5/2-622 (West 2018)), alleging Carlson "deviated from

the standard of care in the following ways:

"(a) Failed to diagnose hydronephrosis,

(b) Failed to review prior medical records,

(c) Failed to prescribe an appropriate blood pressure

medication,

(d) Failed to send the patient for a urology consult,

(e) Inappropriately stopped the anticoagulation therapy."

Dunbar claimed Smith died "[a]s a result of one or more of the aforementioned negligent acts or

omissions" by Dr. Carlson.

¶ 8       Defendants' answer denied the complaint's allegations. Discovery culminated in

both parties taking various witness depositions, including the doctors who treated Smith and

Dunbar's controlled expert witnesses.

¶ 9                          A. Dr. Kenneth Nelson, M.D.

¶ 10      Dr. Kenneth Nelson, M.D., testified to his credentials as an expert witness, noting

he was licensed to practice medicine in Illinois, was board-certified in family medicine, and had

a certificate of added qualification in hypertension. He had been practicing medicine since 1986.

Dr. Nelson testified several of Dr. Carlson's decisions, actions, and omissions deviated from the

standard of care. Dr. Nelson specifically identified Dr. Carlson's decision to prescribe lisinopril

and hydrochlorothiazide and not a statin medication to treat Smith's blood pressure and lipid

levels. He opined Smith's presentation as a male smoker with atherosclerotic disease of the aorta,

kidney disease, abnormal lab results, and high blood pressure required the physician to prescribe

a statin. Dr. Nelson next opined Dr. Carlson deviated from the standard of care by not making an

urgent referral for Smith to see a urologist or nephrologist in January or February 2017. Dr.

Nelson explained Dr. Carlson should have followed up with Smith sooner than he did and referred him to a specialist because Smith went from stage 3 to stage 4 kidney disease from January to February. Dr. Nelson further explained how Smith's heart and kidney diseases were related. He noted Smith's coronary artery disease "changed the risk factor need to get him on a statin, which wasn't done." He went on to state, "[T]he combination of chronic and acute kidney injury can jack up the [blood] pressure; and the pressure elevation can be a cause for the damage to the heart."

¶ 11        Dr. Nelson ultimately agreed, "[I]t's more likely true than not that if Mr. Smith had gotten the treatment that should have been given *** that he would not have suffered a fatal myocardial infarction within eight to nine months of his first visit with Dr. Carlson." Dr. Nelson explained:

> "The patient would have been put on a statin with the goal of getting it less than 70, which in and of itself would have impacted stabilization of the plaque that ruptured. The patient's blood pressure would have been better controlled. The patient's obstructive outlet syndrome, which improved in May and June, had it been treated earlier, would not have led to the kidney damage that resulted in the need to stop the Xarelto. So he would have been on that, and that cardio-protective effect would have been there.
>
> Even assuming he still would have smoked and not exercised and done everything else the way he did, the statin, the Xarelto, the lower blood pressure, he would not have died in

August of a myocardial infarction. That is my expert opinion." Dr. Nelson summarized, "[T]he kidney was at the core of all this," and Dr. Carlson's "failure to recognize that outlet obstruction and hydronephrosis accelerated everything by either omitting drugs, not using drugs, stopping drugs, but just not treating the ultimate problems in a timely fashion."

¶ 12                             B. Dr. Matthew Budoff, M.D.

¶ 13         As an expert witness, Dr. Matthew Budoff, M.D., testified he was licensed to practice medicine in Wisconsin and California, and he was board-certified in "[c]ardiology and cardiovascular CT." He had previously been board-certified in internal medicine, but his certification expired in 2013. Dr. Budoff noted he had been a primary care physician in 1993-94, and he explained he acts as the sole doctor for some of his patients, so he sometimes will "cross over into internal medicine still for some of my patients," even though his practice was now limited to cardiology. Dr. Budoff testified he used guidelines to inform his opinions on Smith's care, namely "the 2013 ACC/AHA Guidelines for the Management for Blood Lipids" and the "2001 Blood Pressure Guideline." He explained he did not use the new guidelines published at the end of 2017 because those postdated Smith's death.

¶ 14         Dr. Budoff agreed "the gist of [his] opinions" in this case was "that [Dr. Carlson] should have been adjusting [medications] to bring the blood pressure down more aggressively." For example, he criticized Dr. Carlson's decision to prescribe Smith lisinopril and terazosin. He called lisinopril "an unusual choice because it can cause worsening renal insufficiency which it did in this case." He labeled terazosin "a seventh-line therapy for blood pressure," "which is not considered an adequate blood pressure regimen." Dr. Budoff described Dr. Carlson's approach to treating Smith's high blood pressure as "a little bit risky given [Smith's] known renal

insufficiency." He opined lisinopril could work, but the patient's renal function would have to be watched closely, and the medicine changed, which did not happen in this case. Dr. Budoff testified, based on his review of the medical records, Dr. Carlson oversaw Smith's blood pressure medications through July 2017, when the nephrologist increased terazosin. Dr. Budoff testified Dr. Carlson deviated from the standard of care by not prescribing Smith a statin medication in January 2017 and the deviation continued for every visit afterwards. He based his opinion on the 2013 cholesterol guidelines, which required a patient with Smith's risk for atherosclerotic cardiovascular disease (ASCVD) and his lab results "should be put on a moderate-or-high-intensity statin."

¶ 15          Dr. Budoff testified he calculated Smith's ASCVD risk (*i.e.*, risk of a heart attack within 10 years) to be between 19% and 30%. He opined prescribing a statin would have lowered Smith's ASCVD risk "considerably" because a moderate-intensity statin would have reduced Smith's low-density lipoprotein cholesterol by 35% to 40% and a high-intensity statin would have lowered it by 50%. Dr. Budoff testified "that within that eight-month time period," from January to August, "there would have been a significant reduction in cardiovascular events if [Dr. Carlson] had initiated a statin in January of 2017."

¶ 16          Dr. Budoff testified his expert opinion was that "with better blood pressure control and statin therapy, it is more likely than not [Smith] would have not had the fatal myocardial infarction in August of 2017." Budoff based his opinion on the Ascot trial, where it showed atorvastatin in hypertension "lowered cardiovascular events by 36 percent." He then noted that blood pressure control "would add another 30 percent event reduction for ASCVD or heart attacks." Dr. Budoff acknowledged "every male over 45 is at some risk" for a heart attack," but Smith "would have been at lower risk, significantly lower risk if he had been on those, good

blood pressure control and a statin in January of 2017." Although Dr. Budoff did not calculate what Smith's ASCVD risk would have been in August 2017 had he been put on a different blood pressure medication and a statin, he testified that had Dr. Carlson complied with the standard of care, Smith's "risk would be 60 percent lower than when he died."

¶ 17    Dr. Budoff testified Smith's "continued hypertension over eight months definitely contributed, in my opinion, to his atherosclerosis progression and his risk of that plaque rupturing." Because blood pressure "is a continuous variable," Dr. Budoff could not pinpoint the latest possible point in time when Dr. Carlson could have prescribed a medication other than lisinopril or hydrochlorothiazide that would have lowered Smith's ASCVD risk. By contrast, Dr. Budoff opined:

> "I think for statins we know that the earliest study that we know of
>
> benefit is 30 days. So it's at least a month before his event to have
>
> helped stabilize his plaque, lower inflammation, lower cholesterol,
>
> all things we know statins do to take effect.
>
> So at least 30 days for statins."

¶ 18    C. Dr. David Rosborough, M.D.

¶ 19    Dr. David Rosborough, M.D., testified he was board-certified in nephrology and hypertension. He noted he began treating Smith on May 24, 2017, and saw him last on July 11, 2017. He assessed Smith for "acute-on-chronic kidney disease" with "underlying [chronic kidney disease]." By the time Smith presented to Dr. Rosborough in May, his lisinopril and hydrochlorothiazide had been put on hold Dr. Rosborough testified he "thought that Dr. Carlson was the primary care physician managing [Smith's] hypertension." He disagreed he was "comanaging [Smith's] hypertension with Dr. Carlson," explaining, "I saw him twice, and on the

second visit I adjusted an antihypertensive." Nevertheless, Dr. Rosborough opined Smith's "blood pressure medication management *** at the times [he] saw him" was "[c]ompletely appropriate." He testified he did not think Smith presented to him with "any urgent or emergent conditions that needed treatment right away."

¶ 20                                    D. Dr. Wendy Olson Padilla, M.D.

¶ 21          In her deposition, Dr. Wendy Olson Padilla, M.D., testified she was board-certified in urology, licensed to practice medicine in Illinois, and employed at OSF. She noted she evaluated Smith in May 2017 for benign prostatic hyperplasia, urinary retention, and bilateral hydronephrosis. She treated Smith by inserting a Foley catheter, prescribing Flomax, and sending him for more tests. She testified Smith's lab results eventually improved with treatment, but he still required a catheter. Dr. Padilla noted Smith's condition was stable (it did not significantly worsen or improve) from June 7 to June 21, 2017. She testified, as of June 21, 2017, the final time she treated him, Smith "didn't need any urgent or emergent urological intervention." Dr. Padilla opined urinary retention and bilateral hydronephrosis can affect a patient's blood pressure. She stated she did not manage Smith's hypertension and expected it to be managed by a primary care physician or nephrologist.

¶ 22                                    E. Summary Judgment

¶ 23          In May 2024, defendants moved for summary judgment, maintaining "Plaintiff's case has a fatal proximate cause gap because there is no testimony that referrals to urology or nephrology would have changed the outcome here." They attached to the motion Dunbar's complaint, plaintiff's Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) disclosures, letters from Dr. Nelson to plaintiff's counsel dated July 2022 and July 2025, curriculum vitae from Drs. Nelson and Carlson, and the doctors' deposition transcripts. Dunbar filed a response, arguing

summary judgment would be inappropriate because testimony from Drs. Budoff and Nelson created a fact question relating to proximate cause. Dunbar's response cited the Rule 213(f) disclosures and the depositions of Drs. Nelson, Carlson, and Budoff.

¶ 24   The trial court held a hearing on defendants' summary judgment motion on August 1, 2024. Defense counsel compressed the case into one claim, saying "all roads to Plaintiff's claims against Dr. Carlson relate back to this failure to refer to nephrology or urology." Counsel then parroted the motion by arguing the evidence revealed a gap in proximate cause because Dunbar had not provided testimony from a nephrologist or urologist about what treatment Smith would have received if he had been referred earlier than May 2017. Dunbar's counsel rebuffed the defense's claims that this case could be reduced to the urology or nephrology referrals and argued, "There are other criticisms of Dr. Carlson," particularly, "a number of theories related to Dr. Carlson's mismanagement of this patient's blood pressure and cholesterol medication beginning in January of 2017." Counsel confirmed he presented expert opinion testimony on the standard of care and proximate cause. As for the latter, counsel quoted from Dr. Budoff's testimony explaining his opinion that Dr. Carlson's failure to prescribe a statin proximately caused Smith's death. Counsel also quoted from Dr. Nelson's deposition testimony relating to causation. Counsel argued the expert testimony "creates questions of fact that defeat summary judgment."

¶ 25   The trial court rendered its decision from the bench immediately, finding:

"All right. Thank you, both of you.

I have reviewed the briefs and the testimony that has been given in this case. Taking everything in the light most favorable to the Plaintiff, as I'm required to do so, I do believe that [defense

counsel's] arguments are valid and substantiated by the record.

Therefore, I'm going to grant the motion for summary judgment."

The court directed defense counsel to prepare a written order. On August 5, 2024, the court issued an equally perfunctory, barebones order granting defendants' motion for summary judgment.

¶ 26    This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, Dunbar argues the trial court erred in granting summary judgment because there remained genuine issues of material fact as to whether Dr. Carlson's acts or omissions in treating Smith proximately caused Smith's heart attack and death. Defendants maintain summary judgment was appropriate because Dunbar did not establish through expert testimony that Dr. Carlson's conduct proximately caused injury to Smith. Defendants also raise new arguments on appeal relating to the complaint and standard of care. Because defendants did not present those arguments to the trial court, we deem them forfeited for purpose of this appeal. See *Lewis v. OSF Healthcare System*, 2022 IL App (4th) 220016, ¶ 60 ("It is well settled that issues not raised in the trial court are forfeited and cannot be raised for the first time on appeal."). At oral argument, defense counsel urged us to address these new claims, arguing that this court can affirm the trial court on any basis in the record. See *Owen v. Village of Maywood*, 2023 IL App (1st) 220350, ¶ 18. Counsel's argument misappropriates a legal principle giving us the discretion to act *sua sponte* when affirming a lower court and expands it to give him license to raise new arguments on appeal. This cannot be what *Owen* means; otherwise, the law on forfeiture or waiver would be a nullity. See *Walsh v. Sklar*, 2025 IL App (1st) 231830, ¶ 60 (Courts may overlook " 'waiver or forfeiture in the interests of achieving a just result and

- 10 -

maintaining a sound and uniform body of precedent.' " Nonetheless, "the rule does not 'nullify standard waiver and forfeiture principles' and it should 'not be a catchall conferring on reviewing courts unfettered authority to consider forfeited issues at will.' ") (quoting *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33).

¶ 29 On the proximate cause argument, we agree with Dunbar and reverse the trial court's judgment. We find numerous problems with the court's decision.

¶ 30 A. Summary Judgment

¶ 31 "Summary judgment is appropriate when the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmoving party and strictly against the moving party, reveal that (1) no genuine issue of material fact exists and (2) the moving party is entitled to judgment as a matter of law." *Jackson v. Graham*, 323 Ill. App. 3d 766, 778-79 (2001); see 735 ILCS 5/2-1005(c) (West 2024). To survive a summary judgment motion, the plaintiff " 'need not prove her case, but she must present a factual basis that would *arguably* entitle her to a judgment.' " (Emphasis added.) *Enbridge Pipeline (Illinois), LLC v. Kiefer*, 2017 IL App (4th) 150342, ¶ 35 (quoting *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12).

¶ 32 Summary judgment should be granted sparingly because it "is a drastic remedy." *Smock v. Hale*, 197 Ill. App. 3d 732, 741 (1990). We have long said a trial court "must act with great caution in entering summary judgment to avoid preempting litigants from presenting the full factual basis of their cause in medical malpractice actions." *Smock*, 197 Ill. App. 3d at 741; see *Hansbrough v. Kosyak*, 141 Ill. App. 3d 538, 547 (1986) ("[I]n medical malpractice cases, the trial court should be extremely cautious in entering summary judgment."). If there is *any* doubt about the moving party's right to judgment as a matter of law, then the court should deny

the motion and allow the case to proceed to trial. *Jackson*, 323 Ill. App. 3d at 779.

¶ 33    Summary judgment is not the proper vehicle (and should not be used) to try factual issues. *Lewis*, 2022 IL App (4th) 220016, ¶ 37. Our supreme court has instructed, "The purpose of summary judgment is to determine whether a question of fact exists." *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333 (1996). Indeed, the first step in our *de novo* review is to review the record to determine if there exists a genuine issue of material fact. *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360 (2009). "An issue is 'genuine' if the record contains evidence to support the position of the nonmoving party." *Herman*, 388 Ill. App. 3d at 360 (citing *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 670 (1992)).

¶ 34    B. Medical Malpractice, Proximate Cause, and the Lost Chance Doctrine

¶ 35    "In a medical negligence action, a plaintiff must prove a duty owed by the defendant physician, a breach of that duty, an injury proximately caused by the breach, and resultant damages." *Lewis*, 2022 IL App (4th) 220016, ¶ 49. At this stage of the litigation, given defendant's summary judgment motion, this case turns upon the proximate cause element.

¶ 36    Reduced to its simplest terms, "proximate cause requires [the] plaintiff to prove that [the] defendant's negligence 'more probably than not' caused [the] plaintiff's injury." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). In medical malpractice actions, a plaintiff can plead and prove proximate cause through the "lost chance" or "loss of chance" doctrine. This proximate-cause theory applies to cases where a medical provider's "malpractice deprives [the plaintiff] of a chance to survive or recover from a health problem, lessens the effectiveness of treatment, or increases the risk of an unfavorable outcome." *Lambie v. Schneider*, 305 Ill. App. 3d 421, 426 (1999) (citing *Holton*, 176 Ill. 2d at 111). Under the lost chance doctrine, "the plaintiff must only show with a reasonable degree of medical certainty that

the malpractice lessened the effectiveness of the treatment to [the] plaintiff." *Lambie*, 305 Ill. App. 3d at 426 (citing *Holton*, 176 Ill. 2d at 117-18). Plaintiffs need not "prove that they would have enjoyed a greater than 50% chance of survival or recovery absent the alleged malpractice of the defendant." *Holton*, 176 Ill. 2d at 119.

¶ 37    Generally, plaintiffs establish proximate cause through expert testimony, even when they pursue the lost chance doctrine. See *Mengelson v. Ingalls Health Ventures*, 323 Ill. App. 3d 69, 74-75 (2001). "Proximate cause is not established, however, where the causal connection is contingent, speculative, or merely possible." (Internal quotation marks omitted.) *Mengelson*, 323 Ill. App. 3d at 75. No matter the theory pled and pursued, "[i]t is well established that issues involving proximate cause are fact specific and therefore uniquely for the jury's determination [citation], unless there is no material issue regarding the matter." *Mengelson*, 323 Ill. App. 3d at 75-76.

¶ 38    Dunbar grounds her medical malpractice claim in the lost chance doctrine. On appeal, she maintains, "Dr. Carlson's deviations from the standard of care increased the risk that [Smith] would suffer a myocardial infarction, and deprived [Smith] of a chance at earlier treatment that could have been successful." Dunbar highlights Dr. Carlson's mismanagement of Smith's "blood pressure, specifically failing to prescribe a statin, prescribing Lisinopril which accelerated [Smith's] kidney problems, and by prescribing Terazosin." She also emphasized Dr. Carlson's failure to timely refer Smith to a nephrologist or urologist. Dunbar supported these proximate-cause arguments through expert testimony from Dr. Nelson and Dr. Budoff.

¶ 39    Defendants' argument on appeal mirrors that from their summary judgment motion—"Dunbar did not establish through expert testimony that Dr. Carlson's conduct proximately caused injury to Smith." Defendants reason that since Dunbar did not present expert

testimony about how a nephrologist or urologist would have treated Smith in January and February 2017, there is a fatal gap in the proximate-cause evidence. Defendants direct our attention to a handful of cases decided on a supposedly fatal gap in proximate cause. As we will explain, we find none of those cases binding or even persuasive.

¶ 40 Most of the cases defendant cites were decided on posttrial motions for a directed verdict or judgment notwithstanding the verdict (JNOV). See, *e.g.*, *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997); *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406 (2000); *Guerra v. Advanced Pain Centers S.C.*, 2018 IL App (1st) 171857. The different procedural postures make these cases inapt here.

¶ 41 At oral argument, defense counsel argued the Illinois Supreme Court has held that the standards governing a summary judgment, a directed verdict, and a JNOV are the same. He did not provide a case citation for the claim, nor did his brief. But based on Dunbar's briefing, we presume counsel was referencing the supreme court's decision in *Jones v. Pneumo Abex LLC*, 2019 IL 123895, ¶¶ 25-28. In our view, *Jones* did not announce a new legal rule applicable in all future cases that summary judgment, directed verdict, and JNOV standards are the same. Considering the language the supreme court used, we understand *Jones* to be limited to its unique facts and procedural posture. As the court explained, *Jones* "[did] not present the typical summary judgment scenario, where the issues in dispute have yet to face the scrutiny of a trier of fact and the objective is to determine whether a genuine issue of material fact exists." *Jones*, 2019 IL 123895, ¶ 24. As part of decades-long asbestos litigation, *Jones* arose "from a long and well-documented historical record that has been thoroughly explored and aggressively tested in the course of the scores of lawsuits spanning more than two decades involving conduct that occurred long ago." *Jones*, 2019 IL 123895, ¶ 24. The court found, "*In such cases*, there is no

- 14 -

practical difference between the standard for summary judgment and that governing directed verdicts." (Emphasis added.) *Jones*, 2019 IL 123895, ¶ 25. And so it held, "*Under these circumstances*," the appellate court erred in distinguishing the cases involving Pneumo Abex "on the grounds that the standard governing [the] motions in [the] case was different." (Emphasis added.) *Jones*, 2019 IL 123895, ¶ 27. Given the limiting language the *Jones* court used, we cannot agree with defense counsel's position. The standard governing summary judgment differs from the standard for a directed verdict or JNOV.

¶ 42       As is well established in Illinois law, the standards for a directed verdict and JNOV are the same. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 499 (1967). Both are posttrial motions considered after the jury has seen the evidence and has been able to weigh the credibility of the witnesses. Directed verdicts and JNOVs are both granted only when *all the evidence*, considered in a light most favorable to the party opposing the motion, *leads to only one possible legal conclusion. Pedrick*, 37 Ill. 2d at 513-14. Put differently, the trial court must determine if all the evidence "so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill. 2d at 513-14; see *Anderson v. Nelsen*, 2023 IL App (4th) 220801, ¶ 85. Posttrial motions in this circumstance address the sufficiency of the evidence to establish one or more *elements* necessary to sustain the claim and establish liability.

¶ 43       This is not the same for summary judgment, a pretrial motion. In considering a motion for summary judgment, the trial court determines only whether there are sufficient factual bases for *claims* to allow the matter to proceed to trial. In doing so, the court considers pleadings, affidavits, depositions, admissions, and the exhibits on file, some of which may have not yet been tested for admissibility at trial or subject to adversarial testing through cross-examination.

More importantly, to survive summary judgment the nonmoving party does not need to prove her case, but she must present evidence that creates a genuine issue of material fact. *Enbridge*, 2017 IL App (4th) 150342, ¶ 35. Summary judgment is not a trial. Courts do not try issues but merely determine if issues exist for trial. *Lewis*, 2022 IL App (4th) 220016, ¶ 37. Unlike a directed verdict or JNOV, the court should not be considering whether all the evidence leads to one possible conclusion, but, rather, it must consider whether the factual basis would *arguably* entitle the nonmoving party to a judgment. *Enbridge*, 2017 IL App (4th) 150342, ¶ 35. The court asks whether the plaintiff pled and presented facts sufficient to permit the matter to proceed—not whether the plaintiff established their claims sufficiently to support a finding of liability.

¶ 44      While the procedure for the standards may be similar—trial courts consider the evidence in the light most favorable to the nonmoving party—the substance is necessarily different because courts are evaluating the evidence under distinct rubrics. The question when considering a motion for summary judgment is whether the designated evidence creates a genuine issue of material fact that needs to be tried by a jury. The question when considering a motion for a directed verdict or JNOV is whether all the evidence so overwhelmingly favors one party that no contrary verdict could ever stand. Not only are the substantive standards different, the purposes behind the various motions differ. In considering motions for directed verdicts or JNOV, the court is deciding liability. Regarding summary judgment, the judge is considering if a party provided a sufficient factual basis to require a trial, where liability will be decided.

¶ 45      Deciding a case on a supposed gap in proximate cause could be appropriate when all the evidence has been subjected to scrutiny, all the evidence has been presented, and the jury has had a chance to weigh the evidence and judge credibility. It is not appropriate at the summary judgment stage, where it is likely none of the above has yet happened. Summary

- 16 -

judgment should not short circuit potentially viable medical malpractice claims, so trial courts must be extremely cautious in granting the motion. *Smock*, 197 Ill. App. 3d at 741.

¶ 46        We next observe defendants did not cite a case from the Fourth District where a trial court decided the matter at the summary judgment stage based on a gap in proximate cause, probably because one does not exist. Our research did not yield one. Furthermore, we have never cited, adopted, or applied the First District's decisions in *Aguilera*, *Townsend*, or *Guerra* for the principle of a proximate cause gap—nor must we now. We are not bound by orders from our sister districts and are not required to follow or even defer to them. *Sunbelt Rentals, Inc. v. Ehlers*, 394 Ill. App. 3d 421, 431-32 (2009), *overruled on other grounds by Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871. To be sure, "the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions or panels." *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). Given the different standards and purpose of summary judgment versus a directed verdict or JNOV, we are not persuaded to follow *Aguilera*, *Townsend*, or *Guerra*.

¶ 47        The few summary judgment cases cited by defendants that apply the proximate-cause-gap concept are distinguishable and unpersuasive here. In *Freeman v. Crays*, 2018 IL App (2d) 170169, ¶ 1, the trial court twice granted defense motions to bar testimony from plaintiff's lone expert witness, finding the expert "unqualified to offer any opinions on the issue of causation." Since the plaintiff had no expert witness testimony as to proximate cause, the court granted the defendant's motion for summary judgment. *Freeman*, 2018 IL App (2d) 170169, ¶ 1. Here, by contrast, there was no motion to bar either Dr. Nelson's or Dr. Budoff's testimony, so Dunbar produced expert testimony on proximate cause. Thus, *Freeman* is inapt here.

¶ 48        In *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830 (2010), cited only

briefly by defendant, the trial court granted the defendant's summary judgment motion, finding insufficient proximate cause. There, the court determined

> "there was no expert testimony to a reasonable degree of medical
>
> certainty that a referral by any defendant to a delivering
>
> obstetrician would have led to the need for surgical intervention on
>
> November 5 and, therefore, no evidence that the alleged deviations
>
> from the standard of care 'increased her risk of harm.' " *Johnson*,
>
> 402 Ill. App. 3d at 845.

The court determined a factfinder would be left to speculate as to proximate cause, so summary judgment was warranted. *Johnson*, 402 Ill. App. 3d at 845-47.

¶ 49    In *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 298 (2008), the litigation centered on plaintiff's claims that the defendant doctor's negligent delay in ordering a CT scan lessened the effectiveness of medical treatment. The plaintiff reasoned that had the patient undergone a CT scan earlier, then she would have undergone treatment sooner and not suffered a brain herniation. *Searle*, 385 Ill. App. 3d at 298. At a hearing on the motion for summary judgment, the plaintiff presented expert testimony that the defendant doctor "deviated from the proper standard of care by failing to order a CT scan or neurological consult" but failed to provide expert testimony, stating, to a reasonable degree of medical certainty, that the alleged deviations caused the injuries or lessened the effectiveness of medical treatment because neither expert could testify about what treatment would have followed an earlier CT scan. *Searle*, 385 Ill. App. 3d at 299. One expert acknowledged he would have to speculate as to when treatment would have occurred if a CT scan had been done earlier. *Searle*, 385 Ill. App. 3d at 299. The other testified he did not know what, if any, intervention would have been warranted from an earlier

CT scan. *Searle*, 385 Ill. App. 3d at 299. The trial court granted the defendant summary judgment, finding " 'the mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation.' " *Searle*, 385 Ill. App. 3d at 299 (quoting *Susnis v. Radfar*, 317 Ill. App. 3d 817, 827 (2000)).

¶ 50       As with *Aguilera*, *Townsend*, and *Guerra*, we have not cited *Freeman*, *Johnson*, or *Searle* for the proximate-cause-gap language. So, assuming, without agreeing, the above cases were rightly decided based on a supposed gap in proximate cause at the summary judgment stage, we find the case before us distinguishable for two reasons. First, unlike *Johnson* and *Searle*, and despite defendants' best efforts to frame the case differently, the present case cannot be reduced to Dr. Carlson's failure to timely refer Smith to a nephrologist or urologist. Dunbar clearly pled facts alleging other negligent acts and omissions by Dr. Carlson and presented expert testimony that those deviations from the standard of care proximately caused Smith's injury. Specifically, Dunbar alleged Dr. Carlson's mismanagement of Smith's blood pressure medications and failure to prescribe a statin increased the risk of harm to Smith. Incredibly, for reasons known only to it, the trial court's focus was narrowed to follow the defense's view of the case "that all roads to Plaintiff's claims against Dr. Carlson relate back to this failure to refer to nephrology or urology." This artificially truncated the cause of action to the one area defendant sought to improperly assert a proximate-cause-gap theory more properly applied at the conclusion of the evidence. At this stage in the litigation, this case is about more than urology or nephrology referrals, and the only issue before the court is whether there are genuine issues of material fact.

¶ 51       Second, unlike *Johnson* and *Searle*, here, we are not left to speculate as to what would have happened if Dr. Carlson acted quicker in sending Smith to specialists. The record

clearly documents the treatment Smith received once he was referred to specialists. Dr. Nelson and Dr. Budoff knew exactly how Dr. Rosborough and Dr. Padilla treated Smith's kidney failure and urinary retention. More importantly, they knew the May 2017 treatment of prescribing Flomax and inserting a Foley catheter improved Smith's symptoms and conditions. Dr. Nelson's and Budoff's opinions were neither conclusory nor speculative—they were fact-based. One can reasonably infer from the evidence that Dr. Carlson's alleged delay in referring Smith to specialists lessened the effectiveness of treatment or increased the risk of harm to Smith. Dunbar's experts said so. Put differently, from the evidence, we can reasonably infer that had Dr. Carlson referred Smith to a specialist in January or February 2017, the treatment would have been the same and just as effective at alleviating Smith's symptoms. Citing the above cases, where the patients received *no* intervening specialist care before suffering a catastrophic event, defendants maintain Dunbar was required to provide expert testimony of how a urologist or nephrologist would have treated Smith in January or February 2017; otherwise, we are left to speculate. Reasonable inferences are not speculation. They are based on evidence. Not only are reasonable inferences appropriate at the summary judgment stage, "courts *must* draw all reasonable inferences in favor of the nonmoving party." (Emphasis added.) *DeMambro v. City of Springfield*, 2013 IL App (4th) 120957, ¶ 11. Ultimately, we are unpersuaded by defendant's proximate cause argument and the cases cited in support of that argument.

¶ 52                                    C. This Case

¶ 53          Considering the record before us, looking at it in the light most favorable to Dunbar and strictly against defendants, we find there exists a genuine issue of material fact relating to proximate cause. See *Jackson*, 323 Ill. App. 3d at 778-79. Dunbar presented expert testimony providing two opinions, to a reasonable degree of medical certainty, that Dr. Carlson's

alleged deviations from the standard of care increased the risk of harm to Smith and lessened the effectiveness of treatment. First, Dr. Nelson opined, "[I]t's more likely true than not that if Mr. Smith had gotten the treatment that should have been given," namely, an earlier referral to a urologist and nephrologist, better blood pressure management, and a statin prescription, then "he would not have suffered a fatal myocardial infarction within eight to nine months of his first visit with Dr. Carlson." Dr. Nelson explained the basis for his opinion, noting Smith "would have been put on a statin ***, which in and of itself would have impacted stabilization of the plaque that ruptured." He further noted Smith's "blood pressure would have been better controlled" and his "obstructive outlet syndrome, which improved in May and June, had it been treated earlier, would not have led to the kidney damage that resulted in the need to stop the Xarelto." Dr. Nelson then summarized reasons for his opinion on proximate cause, stating, "[T]he statin, the Xarelto, the lower blood pressure, he would not have died in August of a myocardial infarction. That is my expert opinion."

¶ 54        Second, Dr. Budoff testified Smith's "continued hypertension over eight months definitely contributed" to Smith's heart disease. Dr. Budoff testified to his expert opinion that "with better blood pressure control and statin therapy, it is more likely than not [Smith] would have not had the fatal myocardial infarction in August 2017." He labeled Dr. Carlson's decision to prescribe Smith lisinopril, hydrochlorothiazide, and terazosin, "a little bit risky given [Smith's] known renal insufficiency." He explained lisinopril "can cause worsening renal insufficiency which it did in this case," and terazosin was "not considered an adequate blood pressure regimen." Dr. Budoff based his expert opinion, in part, on Smith's ASCVD risk. He testified Smith "had a calculated 10-year risk of ASDVD between 19 and 30 percent." He opined Smith "would have been at lower risk, significantly lower risk if he had been on *** good blood

pressure control and a statin in January of 2017." While he did not calculate what Smith's "exact" ASCVD risk would have been had he been put on a statin and had better blood pressure medications, Dr. Budoff testified statins "lowered cardiovascular events by 36 percent" and blood pressure control "would add another 30 percent event reduction for ASCVD or heart attacks." Citing various studies, Dr. Budoff testified a statin medication can begin working to lower a person's risk of a heart attack in 30 days. He opined a statin would have benefited Smith if Dr. Carlson had prescribed it "at least 30 days" before the fatal heart attack.

¶ 55        This expert testimony undoubtedly created a genuine issue of material fact as to proximate cause in this case. Dr. Nelson's and Dr. Budoff's opinion testimony supported Dunbar's position that Dr. Carlson's negligence caused Smith's injury and death, which is all it needed to do at this stage. See *Herman*, 388 Ill. App. 3d at 360 (defining a "genuine" issue for purposes of summary judgment). Substantively, *Holton*'s rule echoes through Dr. Nelson's and Dr. Budoff's testimony that Dr. Carlson's actions or omissions in treating Smith "more likely than not" caused Smith's fatal heart attack. *Holton*, 176 Ill. 2d at 107 (holding a plaintiff establishes proximate cause when she shows "that [the] defendant's negligence 'more probably than not' caused [her] injury"). Even more, for purposes of the lost chance doctrine, Dr. Nelson and Budoff both testified "to a reasonable degree of medical certainty" that Dr. Carlson's malpractice lessened the effectiveness of treatment to Smith and/or increased his risk of harm. See *Lambie*, 305 Ill. App. 3d at 426 (stating a plaintiff proceeding under the lost chance theory for proximate cause "must only show with a reasonable degree of medical certainty that the medical malpractice lessened the effectiveness of the treatment"). Besides their subjective experience from practicing medicine for decades, both experts relied on objective guidelines and studies in forming their opinions. Dunbar unquestionably met the proximate-cause criteria for a

medical malpractice claim to survive summary judgment.

¶ 56     At the summary judgment stage, a plaintiff need only " 'present a factual basis that would arguably entitle her to a judgment.' " *Enbridge*, 2017 IL App (4th) 150342, ¶ 35. The expert opinion testimony from Dr. Nelson and Dr. Budoff provides a factual basis for a factfinder to conclude Dr. Carlson's decisions about medications and delay about referrals proximately caused Smiths death. In other words, the expert testimony would *arguably* entitle Dunbar to relief. We find no basis for the application of defendant's gap-in-proximate-cause theory at the summary judgment stage, and do not find cases from other districts persuasive, considering the substantive and procedural differences between summary judgment and directed verdicts. Consequently, there is a genuine issue of material fact as to proximate cause, which precludes summary judgment. That is all that must be decided in this case. That is all that should have been decided at the summary judgment stage.

¶ 57     We would be remiss if we failed to remind the trial court it should be extremely cautious in summarily granting summary judgment in medical negligence cases or any situation where the issues are complex or so fact dependent. Moreover, while defense counsel correctly noted we evaluate judgments and not reasoning, we caution the court against merely adopting a party's view of the case and arguments without explanation. In a complex case, such as this, the court should have provided some rationale for its decision, either during the oral pronouncement or in the written order. Had it done so, it might have caught the failure to address distinctly separate and independent claims which were unrelated to the argued "gap in proximate cause". Moreso, explaining its reasoning is always of great assistance to courts of review.

¶ 58                               III. CONCLUSION

¶ 59     For the reasons stated, we reverse the trial court's entry of summary judgment.

¶ 60          Reversed.